Harold G. WILLIAMS, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 18159.

United States Court of Appeals
Fifth Circuit.

Jan. 12, 1961.

Edward McCarthy, Jacksonville, Fla., for petitioner, McCarthy, Lane & Adams, Jacksonville, Fla., of counsel.

Karl Schmeidler, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Charles B. E. Freeman, Attys., Dept. of Justice, Washington, D. C., Hart H. Spiegel, Chief Counsel, John M. Morawski, Sp. Atty., Internal Revenue Service, Washington, D. C., for respondent.

Before TUTTLE, Chief Judge, and CAMERON and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This tax case is before us for the second time. On the first appeal, we held that a certain tankship was a capital asset and that the appellant here, Williams, realized capital gain from the sale of the tanker. Williams bought the vessel, partially completed, *more* than six months before the sale. The vessel was enlarged and completed *less* than six months before the sale. We remanded the case to the Tax Court to allocate the taxpayer's profit between long-term and short-term capital gain.[1] Commissioner of Internal Revenue v. Williams, 5 Cir., 1958, 256 F. 2d 152. On remand, the Tax Court held that 20.6% of the gain was long-term capital gain, and 79.4% was short-term capital gain. The petitioner, pursuant to 26 U.S.C. § 7482, challenges this determination, contending that the long-term capital gain was 63.3% and the short-term capital gain was 36.7%. We affirm the decision of the Tax Court.

The essential facts may be briefly stated. March 19, 1946, Marine Industries, a partnership composed of the petitioner and others, acquired title to a partially constructed naval tankship, the YO–206. In the same month Marine Industries began negotiations with the Sinclair Refining Company to sell the YO–206 to Sinclair. At that time the tankship had a capacity of only 6,500 barrels. Sinclair required a tanker with a minimum capacity of 10,000 barrels, a vessel equipped with coils to permit the carrying of molasses, and a completed ship that could be classified and immediately transferred for use in its Cuban operations.

May 13, 1946, Marine Industries made a contract with Sinclair, reciting that it was Sinclair's desire to purchase and Marine Industries' desire to sell the YO–206 "after it shall have been completed as a tankship." The contract incorporated a contemporaneous agreement with the Gibbs Corporation shipyards for a "stretch-out job" to lengthen the vessel forty-six feet and complete it as a tanker. In the contract Sinclair agreed to pay $365,000 for the completed tankship; $65,000 to Marine Industries at the time of signing the agreement, $194,000 to Gibbs shipyards (to be credited on the purchase price) and $106,000 to Marine Industries upon completion of the repairs, final acceptance by Sinclair, and delivery of the bill of sale. Marine Industries agreed to repair or replace any defective material furnished by **it** ap-

1. 26 U.S.C.A. § 117(a) (2) and (4).

pearing within ninety days after the vessel was completed.

November 13, 1946, Marine Industries registered the completed vessel as the F. C. Randall, and the same day executed a bill of sale transferring title to the registered vessel to Sinclair.

Before May 13, 1946, the six-months cut-off date for long-term capital gains computation, Marine Industries spent $57,373.77 toward the acquisition of the F. C. Randall.[2] From May 13, 1946, to November 13, 1946, Marine spent $33,262.42 on the acquisition of the vessel.

But in that same period Sinclair paid Gibbs shipyards $187,500 for construction work on the vessel.[3] Marine paid $6,515.43 as costs of sale of the F. C. Randall. The exact profit realized by Marine from selling the vessel was undetermined until construction was completed and the guarantee period had passed. When the case was tried on remand, the Tax Court allocated the gain on a percentage basis proportionate to the expenditures made by Marine Industries in acquiring the completed vessel before and after May 13, 1946. This worked out as follows:

| | | |
|---|---|---|
| Selling price ........... | | $358,500.00 |
| Stipulated cost of acquisition more than six months prior to sale (20.6%) .............. | $ 57,373.77 | |
| Stipulated cost of acquisition within six months (79.4%) .............. | 220,762.42 | |
| Total Cost of Acquisition . | | 278,136.19 |
| Gross gain ............. | | 80,363.81 |
| Costs of Sale ......... | | 6,515.13 |
| Net Gain .............. | | 73,848.38 |
| Petitioner's share (one-half) ........... | | 36,924.19 |
| Petitioner's long-term capital gain (20.6%) ... | | 7,606.38 |
| Petitioner's short-term capital gain (79.4%) ... | | 29,317.81 |

The petitioner contends that this apportionment is in error, since the $187,500 paid by Sinclair to Gibbs to enlarge the vessel was not part of the seller's cost of acquisition and should be excluded completely from both the partnership costs of acquisition and the selling price of the vessel. The long-term capital gain would then be 63.3% and the short-term capital gain would be 36.7%. Williams contends that Marine Industries received no more than $171,000 for the sale of the tanker, as shown by the partnership return, instead of $358,500 as found by the Tax Court. The argument runs: not only does the contract of sale provide that any increase or decrease in Gibbs's price would be charged or credited to Sinclair, but the shipbuilding price was negotiated entirely between Sinclair and Gibbs; penalties for delay were to benefit Sinclair, not Marine Industries; the bonus

2. The expenditures made by Marine Industries toward the acquisition of the F. C. Randall before and after May 13, 1946, were stipulated.

3. The original contract called for a payment of $194,000, but this was later reduced to $187,500.

for early completion was to be paid by Sinclair, not by Marine Industries. If, so Williams argues, the vessel had been lost before title passed, Sinclair would have recovered from the insurance proceeds the amount of payments it had made, and Gibbs would have recovered its unpaid charges; Marine would have recovered the balance, thus being compensated only to the extent of the insured value over and above the claims of Sinclair and Gibbs. On the strength of these contentions, Williams argues that neither the payments by Sinclair to Gibbs, nor the quid pro quo for them, represented any real acquisition by Marine Industries, and consequently the Tax Court erroneously regarded the $187,500 paid by Sinclair as Marine's cost of acquisition, reducing the long-term capital gain accordingly.

■■ The error in appellant's argument lies in excluding the $187,500 from consideration. This sum was part of the purchase price paid by Sinclair. It paid for improvements that were part of the subject-matter of the sale. According to the contract of sale between Marine Industries and Sinclair, this payment was to be credited on the purchase price of the vessel "with the same force and effect as if * * * paid directly to" Marine Industries. The petitioner urges that this contract provision is a pure formal fiction and that "economic realities", not "legal abstractions", should prevail. Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, 315, 76 S.Ct. 395, 100 L.Ed. 347. Certainly, economic realities control. The economic reality here is that the payment of $187,500 represents costs incident to the conversion of the YO–206

from a partially constructed vessel to the completed tanker specified in the contract of sale. The fact that Marine Industries physically neither received nor paid the money is immaterial. The sale concerned the completed, enlarged tankship; that was the rationale of our holding in Commissioner of Internal Revenue v. Williams, 5 Cir., 1958, 256 F.2d 152, and for that reason we remanded the case to the Tax Court to allocate gain.[4] The money was paid to enlarge and improve Marine's property, and to enable Marine to sell the tankship at a profit. Without the improvements there would have been no sale (and thus no gain at all), since the uncompleted vessel did not meet Sinclair's specifications. The payment clearly inured to Marine's benefit, so for tax purposes we must consider Marine Industries as both receiving and paying the $187,500. Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 181, 65 S.Ct. 591, 89 L.Ed. 830; Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918.

■ The petitioner's alternative contention that the allocation of gain should be made on the basis of value instead of cost is also without merit. Value is used to determine the ratio for allocating basis when *part* of a larger property, acquired at a lump-sum cost, is sold. The ratio of the value of the part to the value of the whole is determined, and then applied to the lump-sum cost to allocate cost to the particular part of the property. Hazeltine Corp. v. Commissioner, 3 Cir., 1937, 89 F.2d 513 (depreciation); The Lehman Co. of America, 17 T.C. 422 (1951) (gain or loss), acquiesced in by Commissioner, I.R.Cum.Bul.1952–1, p. 3. But this principle does not apply to the

4. "We do not think it can be said that the hull YO–206 was not a subject matter of the sale. It was treated as such by the parties and the treatment was the recognition of a fact rather than the creation of a fiction. Obviously something more than the hull YO–206 was acquired by Marine Industries and sold to Sinclair. The partially completed YO–206 and perhaps some additional portion of the later completed tankship were held for the six

month period, and the portion of the gain allocable to that part of the tankship which had been completed more than six months before the sale should be accorded long-term capital-gain treatment. Paul v. Commissioner, 3 Cir., 1953, 206 F.2d 763; Dunigan v. Burnet, 1933, 62 App.D.C. 221, 66 F.2d 201." Commissioner of Internal Revenue v. Williams, 5 Cir , 1958, 256 F.2d 152, 155.

factual situation here: the sale of the F. C. Randall was a sale of the whole property, not of a part. The parts contributed proportionately to the gain resulting from the sale of the whole, but that does not require allocation of gain on the sale of the whole property by measuring the value of its parts.

We have considered, but find it unnecessary to discuss other points the respondent raises.

The decision of the Tax Court is hereby

Affirmed.