**WATERMAN STEAMSHIP CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 2284.**

United States District Court
S. D. Alabama, S. D.
April 2, 1962.

Armbrecht, Jackson, McConnell & De-Mouy, Mobile, Ala., for plaintiff.

Ralph Kennamer, U. S. Atty., Mobile, Ala., Theodore D. Peyser, Jr., Atty., Dept. of Justice, Washington, D. C., for defendant.

DANIEL HOLCOMBE THOMAS, District Judge.

This action arises under the provisions of Sections 1346(a) (1) and 1402, of Title 28, of the United States Code.

Plaintiff is seeking recovery for alleged overpayment of federal income taxes for the years 1947 through 1950, in an amount of $2,811,773.29. There are five major issues raised by the plaintiff's four claims, and one major issue raised by the Government's counter-claim. Each of these issues will be discussed separately in this opinion.

This opinion does not attempt to set forth the final sum to which the parties are entitled in the various issues. Such sums are to be determined by the parties in accordance with regular accounting procedures, reflecting the views herein expressed.

## I.

### WATERMAN BUILDING

This issue raises the questions (A) whether advances to a wholly owned subsidiary resulted in loans to or investments in the subsidiary by the parent and, if it were a loan or an indebtedness, whether or not it became worthless during the taxable year in question; and (B) whether certain stock in the subsidiary owned by plaintiff became worthless during the taxable year in question.

Prior to 1946, the personnel and operations of plaintiff and various of its subsidiary corporations were located in and carried on from several different buildings and localities in the city of Mobile, Alabama, plaintiff's home office and principal place of business. Because this arrangement was unsatisfactory and because plaintiff was unable to obtain sufficient space in an existing building to house all of its offices, plaintiff decided to construct its own office building and adjacent restaurant building.

In May of 1946, plaintiff filed an application with the Civilian Production Administration for authority to construct a sixteen-story office building and adjacent restaurant at an estimated cost of $2,600,000, exclusive of the land and architect's and engineer's fees. Shortly thereafter, plaintiff entered into a cost-plus contract with J. P. Ewin, Inc., for construction of the buildings. An architect was also employed to design the buildings.

Plaintiff determined to establish a subsidiary company to construct, own, and operate the office building. This decision was in line with its policy that any activities other than the steamship business, which was its principal business, would be carried on through subsidiary corporations. This also enabled local banking institutions to lend up to their maximum limits to each of such subsidiary corporations, which maximum would be higher than if they could lend only to plaintiff. On July 19, 1946, Waterman Building Corporation (hereinafter referred to as Building Corporation) was organized as a wholly owned subsidiary of plaintiff with authorized capital stock of $1,500,000 and paid-in capital stock of $375,000. Immediately thereafter, plaintiff assigned to Building Corporation its agreements with the architects and with the contractors for the construction of the building in question. By virtue of this assignment plaintiff was released and Building Corporation assumed all of the plaintiff's duties under the two contracts.

Construction on the new buildings commenced in 1946, with an estimated completion time of eighteen months. However, due to labor difficulties and the failure of materialmen or suppliers to meet schedules, the building was in construction for two years. The ultimate costs of the buildings, without furniture, fixtures, and equipment, came to approximately $4,250,000—greatly in excess of the estimated costs of $2,600,000.

Plaintiff had originally planned to finance the construction of the office building by the maximum obtainable on a loan from some lending institution, which it considered to be about 50% of the estimated cost, with a pay-out of twenty-five years. The remaining 50% was to be financed by plaintiff through its initial capital contribution and by subsequent advances on open account to Building Corporation. Plaintiff planned to lease the office space from its subsidiary and, based on comparable rental figures, the rental payments under such lease would enable the subsidiary to meet the payments on the long-term loan as well as repay the open-account loans of plaintiff.

As it turned out, however, the maximum obtainable loan was $1,000,000, repayable over a twenty-year period. This loan was obtained from Massachusetts Mutual Life Insurance Company, and a note for that amount was executed and delivered by Building Corporation to Massachusetts Mutual, secured by a mortgage on the office and restaurant buildings. At the same time, a twenty-year lease was entered into between plaintiff and Building Corporation, whereby the former agreed to pay the latter $287,039.50 annually as rental for the buildings, which lease was assigned to Massachusetts Mutual as security for the note and mortgage. The lease states that the rental was based on the estimated cost to the Building Corporation of maintaining the office building, paying all taxes and insurance on the leased premises, paying the interest at 4% on a one million dollar loan, and paying $93,102 per year to amortize the loan. If substantial error was made in these estimates, then the rent was to be adjusted accordingly. The annual rental was considered by the plaintiff to be a fair rental based on comparable facilities in the area.

Upon completion of the building and the long-term financing, plaintiff had made loans to Building Corporation in the total amount of $3,125,000. With the loan of $1,000,000 from Massachusetts, $400,000 of this amount was repaid by Building Corporation. However, during operations in 1949, plaintiff had to make further advances to its subsidiary,

so that as of September 30, 1949, Building Corporation owed plaintiff, on open account, $3,110,000. Due to the greatly increased cost of the construction of the building and partially to the failure to have a lease on the restaurant building which would return some income to Building Corporation, the latter was not able, from the income derived from the lease with plaintiff, to repay the indebtedness to plaintiff after making its payments to Massachusetts Mutual. After nine months of operation, it was apparent to the officers of plaintiff that not only was the building corporation failing to show a profit, but it was not generating sufficient cash to reduce the indebtedness to plaintiff within any reasonable period, after meeting its fixed obligations and operating costs. The directors of plaintiff then determined that it would be in the best interest of and would result in material savings to plaintiff, to transfer all of the assets of Building Corporation to plaintiff, with plaintiff assuming all the obligations of Building Corporation, in reduction of the indebtedness of Building Corporation to plaintiff by the market value of those assets less the amount of its obligations assumed. This action was approved by the directors and stockholders of Building Corporation and by the Executive Committee and Directors of the plaintiff, subject to appraisal of building and land by independent real estate appraisers. An agreement between plaintiff and Building Corporation dated September 30, 1949, effectuated this plan.

## A.

■ The first question raised is whether the advances made by plaintiff to its wholly owned subsidiary constitute loans or capital contributions. Different tax consequences attend each such classification. If those advances constitute "debts" as that term is used in Title 26 U.S.C. Sec. 23(k) plaintiff is entitled to a bad debt loss deduction. On the other hand, if those advances constitute capital contributions, reference must be made to those sections of the code concerning liquidation (Secs. 112(b) (6), 115(c)). The answer depends on the intent of the parties, which is to be ascertained from all relevant facts and circumstances. Rowan v. United States, 5th Cir. 1955, 219 F.2d 51.

When making the advances to the Building Corporation, plaintiff never requested or received any notes or other evidence of indebtedness or a mortgage as security. Nor did it request or receive any interest for the use of the funds advanced, nor was a payment date discussed or agreed upon. The government contends that such factors indicate an intention to contribute to the capital of the subsidiary. Such contention, however, fails to recognize what the testimony of plaintiff's witness clearly sets forth. Waterman Corporation dealt with all of its subsidiaries on similar open accounts without interest. Absence of these arrangements is not fatal to the creation of a creditor-debtor relationship. Moreover, the testimony shows that Building Corporation intended to repay the advances through renting to the parent and from income from the restaurant.

■ The burden of proof is on the corporate taxpayer to show the intention to create a loan rather than a capital contribution. Once the taxpayer has done this with supporting evidence the burden shifts to the government to refute such evidence. Where, as here, the government offers no evidence to contradict the evidence of the taxpayer, but merely arbitrarily determines the advances were capital contributions, the evidence offered by the taxpayer, if reasonable and just, when considered from all the relevant facts and circumstances, will be given effect. (See Gounares Bros. & Co. v. United States, 185 F.Supp. 794.)

■ The original intent and purpose of plaintiff changed only after a substantial change in circumstances over which plaintiff had no control. If the building had cost what had been estimated prior to commencement of construction, the original intent and plan would, in all likelihood, have been followed, and Build-

ing Corporation would now be the owner and operator of the building and would have been able to repay the advances or loans made to it by plaintiff. The decision of plaintiff to take over the assets and responsibilities of its subsidiary in part payment of the obligations due it from the subsidiary was a business decision, amply supported by the conditions existing at that time, which conditions could not have been foreseen at the time of the formation of the subsidiary in 1946 and during the time of plaintiff's advances to its subsidiary. There is no evidence whatsoever that the formation of Building Corporation and the advances made to it by plaintiff were for tax purposes alone, or were a sham, or were anything other than loans as designated and treated by both corporations. The Fifth Circuit in the Rowan case, supra, stated as follows:

"Recognizing fully that the Government is not bound in its tax collecting activities by the terminology used by taxpayers if such terminology is actually used to disguise something quite different, we nevertheless have seen no authority for the proposition that the stockholders of a corporation may not determine just how much of their funds they care to risk in the form of capital and how much, if any, they are willing to lend as a credit. If they make such a determination and it is clear that such is their intent, the fact that when they close up the venture and take their loss as to such amount as they have actually loaned the corporation, this leaves them in a position to enjoy more favorable deduction privileges than if they had put it all in as capital, this does not entitle the Commissioner of Internal Revenue to rewrite their balance sheet for them and show to be capital what was intended to be a loan." (219 F.2d at 54)

The court is of the opinion that the advances in question were intended to, and did in fact, constitute loans to the subsidiary, for which the taxpayer may deduct a bad debt loss as provided for in section 23(k). It is therefore unnecessary to discuss the tax aspects of the inadequately capitalized corporation, an issue raised by the government's view of the facts.

Having decided the advances made by plaintiff to Building Corporation were loans, there remains to be determined whether such indebtedness became worthless in the taxable year 1949 and, if so, the amount of such worthless debt.

There is no doubt that on September 30, 1949, Building Corporation transferred all of its assets to plaintiff, with the exception of certain cash and deferred charges in an amount less than $15,000, in return for plaintiff's assuming all the obligations of Building Corporation. As of December 31, 1949, the only assets which Building Corporation owned were certain cash and deferred charges amounting to approximately $12,500. At that time, there was no way possible for Building Corporation to repay the indebtedness due plaintiff. Building Corporation had no marketable assets or any means to raise capital. It was, for practical purposes, finished. The Court finds as a matter of fact that the debt due plaintiff from its subsidiary was worthless, which was determined and fixed in 1949 when all of the assets of the subsidiary were transferred to plaintiff.

Except for the value of the Waterman Building and restaurant and the land on which they were located, the parties stipulated the value of the assets and liabilities transferred by Building Corporation to plaintiff. It is therefore unnecessary to set forth here those figures not in dispute. With regard to the value of the Waterman Building, restaurant, and land, the only evidence presented, other than the stipulated cost thereof, was two appraisal reports of independent agencies offered by the plaintiff. A committee of four real estate appraisers appointed by the Mobile Real Estate Association gave a total market value, as of September 30, 1949, of $2,067,600. At the time of the loan from Massachusetts Mutual, that company had appraised

the property, as of March 16, 1948, at a value of $2,062,220.

■ The value to be attributed to the Waterman Building, restaurant, and land, for purposes of computing the amount of the bad debt loss deduction, is the fair market value of those properties as of September 30, 1949, which the court finds to be $2,067,600. The determination is one of fact.

### B.

■ Plaintiff is also seeking a deduction from its gross income for a loss occasioned by the Building Corporation stock owned by it becoming worthless (Section 23(g) (2)). It is the position of the Government that the stock was exchanged, within the meaning of Sections 115(c) and 112(b) (6), for the property received on September 30, 1949, and hence is not subject to recognition as a capital loss.

The applicable code provisions are explicit in their terms. "For the purposes of this paragraph a distribution shall be considered to be in complete liquidation only if * * * (C) the distribution is by such other corporation in complete cancellation or redemption of all its stock, * * *." (Section 112(b) (6)).

In the instant case, the property transferred by Building Corporation was in consideration of reducing the debt owed by it to the plaintiff. The evidence conclusively establishes that fact. The Tax Court has had opportunity to speak on this point on at least three occasions: Iron Fireman Manufacturing Co., 5 T. C. 452; Spaulding Bakeries, Inc., v. Commissioner, 27 T.C. 684; affirmed on appeal, 2nd Cir., 1958, 252 F.2d 693; Northern Coal & Dock Co., 12 T.C. 42. See also, H. G. Hill Stores, Inc., 44 B.T.A. 1182. In the Spaulding case the Tax Court made these comments:

> "The principle set forth in a number of our decisions where the sole stockholder parent is also the creditor of the subsidiary is applicable here. In those cases we held, in what would otherwise be a Section

112(b) (6) liquidation but for the fact that the distribution to the parent is insufficient to satisfy more than a part of the debt, the parent has both a deductible bad debt and a deductible stock loss." (27 T.C. p. 688)

In view of the foregoing, it is clear that plaintiff is entitled to deduct the sum of $375,000.00 as the amount of worthless stock held by it.

### II.

### BABY FLAT-TOPS

This issue raises three principal questions: (A) whether plaintiff is entitled to depreciation deductions on eleven baby flat-tops owned by it; (B) whether the gain on the sale of six of these vessels should be treated as ordinary income or as capital gain; and (C) if treated as capital gain, how should such gain be apportioned as between long-term and short-term capital gain.

The following facts were stipulated and agreed upon by the parties:

At various dates in the years 1946 and 1947, the Navy Department of the United States Government put out for bid certain escort aircraft carriers (CVE) popularly known as "baby flat-tops". On three occasions during 1946 and 1947, plaintiff, as a result of such advertisements, placed bids for the purchase of eleven baby flat-tops, which bids were accepted by the Navy Department.

After the purchase of each of the said eleven baby flat-tops, plaintiff had the vessels delivered or towed to the shipbuilding facilities of Gulf Shipbuilding Corporation, Mobile, Alabama, a wholly owned subsidiary of plaintiff. There the plaintiff caused each of the baby flat-tops to be converted to a C–3 cargo vessel. Conversions on these eleven baby flat-tops were begun according to the following schedule: two in January 1947, two in February 1947, one in March 1947, two in May 1947, two in July 1947, one in August 1947, and one in September 1947.

During 1947 plaintiff entered into five agreements to sell the converted baby flat-tops to two purchasers. The first agreement to sell, covering one such converted vessel, was entered into in April 1947; the second such agreement, covering one such converted vessel, was entered into in May 1947; the third such agreement, covering two such converted vessels, was entered into in July 1947; the fourth such agreement, covering one such converted vessel, was entered into August 1947; and the fifth such agreement, covering six such converted vessels, was entered into in December 1947. Four of these agreements, covering nine vessels, were made with the Kingdom of the Netherlands and the other agreement, covering the remaining two vessels, and made in July 1947, was with the Blue Star Line, Ltd., of London, England. The sale of each of the converted baby flat-tops was subject to approval through July 1947 of the Navy Department and of the United States Maritime Commission, and after July 1947, of the Navy Department alone.

The actual sale and delivery of each of the eleven converted baby flat-tops sold by plaintiff did not take place until the conversion of each to a C-3 cargo ship had been completed, and final approval of the sales had been given by the Navy Department. These actual sales and deliveries took place one per month, beginning in November 1947 and ending in October 1948, with the exception of the month of February 1948.

On June 11, 1948, plaintiff made application for permission to establish a construction reserve fund under Section 511 of The Merchant Marine Act, 1936, as amended, 46 U.S.C.A. § 1161. On July 15, 1948, such application was approved by the United States Maritime Commission. The gain on the sale of five of the last six converted baby flat-tops sold by plaintiff is not involved in this litigation by reason of the application for and approval of the establish-ment of this construction reserve fund for the plaintiff, and the deposit of the "proceeds" received on the sale of those baby flat-tops in the construction reserve fund.

On March 1, 1947, plaintiff filed with the United States Maritime Commission an application to purchase one C-2 vessel, and under date of July 31, 1947, plaintiff filed an application to purchase ten C-2 vessels, all pursuant to the provisions of the Merchant Ship Sales Act of 1946.[1] On December 4, 1947, the United States Maritime Commission approved the sale of nine C-2's to the plaintiff. On December 17, 1947, plaintiff entered into a contract of sale with the United States Maritime Commission to purchase said nine C-2's. On January 21, 1948, the United States Maritime Commission approved the sale of two C-2's to the plaintiff, and a contract of sale was executed on February 3, 1948.

For depreciation purposes the economic life of each of the eleven baby flat-tops is twenty years. If depreciation is allowed on these vessels, as property used in trade or business, such depreciation for each tax year in question will be as shown in Exhibit 24 filed in the action.

The three principal questions raised in this issue are discussed separately below, with the ruling of the Court as to each.

## A.

▮ The first question raised under this issue is whether taxpayer is entitled to depreciation deduction for 1947 and 1948 with respect to the eleven baby flat-tops, on the ground that while under conversion to C-3 cargo vessels, they were "property used in the trade or business" as provided in Section 23(*l*) of the Internal Revenue Code of 1939.

Shortly after the end of World War II plaintiff needed additional vessels to improve its fleet and to seek its share of the improving world freight market.

1. Plaintiff preferred the C-2 type vessel to the C-3, but was uncertain when it pur-chased the C-3's as to whether the C-2 vessels would be made available to it.

The principal source of vessels at that time was the United States Government. The policy of the Government with regard to the disposition of these vessels had not been established. Plaintiff did not know if the vessels would be sold at what it considered a reasonable price, or if they would have restrictions imposed as to operation or use. Toward the end of 1946, the baby flat-tops, which had been constructed on the hulls of C–3 cargo vessels, became available. These vessels were undocumented and, as such, were unrestricted as to use. Plaintiff's witness testified; "This vessel was about 3,000 dead weight tons larger than the C–2, but, as we had to have some vessels, we didn't know what the Government's policy would be in respect to selling the C–2 to non-subsidized operators, so it offered a very good opportunity to acquire at least some of the vessels we were going to need."

After purchasing the baby flat-tops, plaintiff was informed that the Government policy with regard to the C–2 vessels would be to sell them for unrestricted operation at a price of about one-third of their cost. Plaintiff thereafter made application to purchase one such C–2 cargo vessel on March 1, 1947, and on July 31, 1947, application was made to purchase ten C–2 cargo vessels.

In the meantime, foreign flag operators became interested in the flat-tops and plaintiff learned it could turn a profit on the sale of these vessels after conversion. Plaintiff sold five of the converted baby flat-tops and used the proceeds to buy additional flat-tops. When asked why additional flat-tops were purchased, the witness testified that the steamship corporation found itself in the position of working a hedge inasmuch as they had no way of knowing the application for purchase of C–2 vessels would be acted upon favorably. As a matter of fact, it was not until December 4, 1947, that Government approval was obtained. After such approval was obtained, plaintiff sold the remaining baby flat-tops, and eventually purchased nineteen C–2 cargo vessels.

Plaintiff is claiming depreciation only on the hull of each of the baby flat-tops, without adjusting for the cost of any conversion. Its theory is that the hull is a distinct part of the ship and was depreciating while being converted. As to the additions to the vessels during conversion, depreciation on them would begin after the conversion work had been completed. The Government, on the other hand, says the vessels were not "used in the trade or business" within the meaning of Section 23(l) of the code.

Turning first to the position of the Government, there is no evidence in the record to contradict the fact that the original purpose for and intent of plaintiff's acquisition of the baby flat-tops was to convert them for use in plaintiff's steamship operations. The bids under which the vessels were to be sold specified that they could be purchased only for scrapping or for use, and plaintiff, in its bid, stated that the vessels were being acquired by it for its own use.

Immediately after acquisition the vessels were taken to the shipyard of plaintiff's subsidiary, where conversion operations began. The plans and specifications for conversion of the vessels contemplated a finished product that would be used for the plaintiff's Far Eastern trade routes, and such was the stated intention of the plaintiff.

This intention of plaintiff to use the vessels in its own operations changed after plaintiff had determined to its own satisfaction that the more desirable C–2 vessels would be available.

While I am of the opinion that these vessels were used in the trade or business of plaintiff, within the meaning of the statute, I do not believe that plaintiff is entitled to a deduction for depreciation. On the average, more than ten times the cost of acquisition was expended on reconversion of each of the baby flat-tops. A "reasonable allowance" for depreciation under these circumstances would be a contradiction in terms, and therefore none is allowed.

### B.

■ The second and major question raised under this issue is whether the gains on sales in 1947 and 1948 of six baby flat-tops should be treated (a) as capital gains arising from the sale of property used in taxpayer's trade or business as defined and recognized in Sec. 117(j) of the Internal Revenue Code of 1939 or (b) as ordinary income arising from the sale of property held by the taxpayer primarily for sale to customers in the ordinary course of taxpayer's trade or business.

It is undisputed that the property in question was held for more than six months. The court has ruled that the property is of a character subject to the allowance for depreciation in Sec. 23(l). The question remains whether the property was held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business.

The Government cites Williams v. Commissioner, 5th Cir., 1958, 256 F.2d 152, as authority for the proposition that these vessels were held for sale at the time they were sold. A material difference between that case and this one is that in the former the court found that the vessel was acquired for the purpose of sale. As stated in the discussion on question A above, plaintiff had definite plans and purposes for using these vessels in its own service. Carter-Colton Cigar Company v. C. I. R., 9 T.C. 219; Goldberg v. Commissioner, 5th Cir., 1955, 223 F.2d 709; Gamble v. Commissioner, 5th Cir., 1957, 242 F.2d 586; and Philber Equipment Corporation v. Commissioner, 3rd Cir., 1956, 237 F.2d 129. The Government's contention in this regard is entirely without merit.

Nor do I agree that the venture involving these baby flat-tops qualifies as a business. See Smith v. Dunn, 5th Cir., 1955, 224 F.2d 353. The tests set forth therein to determine whether a venture qualifies as a business include, among others, the extent of improvements, number, extent, continuity, and substantiality of sales, and the efforts made to promote sales. There is no question that considerable time and money were spent on improving these vessels. But such improvements were requisite to placing these vessels in the actual service of the plaintiff. The sales of the baby flat-tops took place during a relatively short period, and were few in number. There were five contracts of sale within an eight-month period. There is no evidence of promotional activity by the plaintiff. All sales were handled through independent brokers, who were engaged in the ship brokerage business.

. These baby flat-tops were originally acquired and held by plaintiff primarily for its own use. Upon learning that the more desirable C–2's might soon be available, plaintiff sold them and purchased additional flat-tops in an effort to hedge against the possibility that the application for purchase of the C–2's might not be acted upon favorably. Under such circumstances, the baby flat-tops could hardly be characterized as falling within the exclusion clause of Section 117(j) (1) (B). Plaintiff is entitled to capital gain treatment on the proceeds of the sale of the six baby flat-tops which are here at issue.

### C.

The last question raised under this issue is whether the capital gains realized on such sales were long-term, short-term, or both; and, if the latter, how the gain should be apportioned between long and short term. Both of the parties seem to agree that if in fact plaintiff is entitled to capital gains treatment, such gains should be apportioned in the proportion that cost incurred before and after a date six months prior to sale bears to the total cost.

There is no serious disagreement between these parties as to whether the gains should be allocated on the basis of cost rather than on value, except as to the vessel Rajah. The Williams case (Williams v. Commissioner, 5th Cir., 1961, 285 F.2d 582) is controlling here, and cost is the proper basis to be used in computing the long and short-term gains. The parties have stipulated in Exhibit 23 the manner in which alloca-

tion shall be made where cost is the basis. This method and the figures set forth therein meet with the approval of the court.

Since there is no valid reason why the gain on the sale of the Rajah should be treated differently, the amount of the long and short-term gains on that vessel will be as set forth in Exhibit 23.

## III.

### FOREIGN TAX CREDIT

This issue raises the question whether plaintiff is entitled to a foreign tax credit, under Section 131 of the Internal Revenue Code of 1939, for taxes paid during 1947 through 1950 to the Republic of the Philippines, pursuant to Section 192 of Title V of the Philippine National Internal Revenue Code.

During the calendar years 1947 through 1950, plaintiff was a domestic corporation and the Republic of the Phil-

ippines was a foreign country within the meaning of such terms as used in Sections 131(a) and (h), of the Internal Revenue Code of 1939. Throughout that period plaintiff maintained an office and a place of business in the Republic of Philippines. During such period plaintiff paid income taxes to the Republic of the Philippines pursuant to Title II of the National Internal Revenue Code, and it also paid additional taxes pursuant to Section 192, Title V of the National Internal Revenue Code.

On its Federal Income Tax Returns for the calendar years 1947 through 1950, plaintiff claimed as foreign tax credits the total amount of taxes paid the Philippine Government under these two Titles. Subsequent to the filing of said returns, it was determined by the Internal Revenue Service that the correct amounts of taxes paid to the Republic of the Philippines during such years are as follows:

| | 1947 | 1948 | 1949 | 1950 |
|---|---|---|---|---|
| Title II | $ 4,792.75 | $ 6,136.53 | $ 3,266.15 | $ 1,886.50 |
| Title V | 19,549.88 | 14,520.28 | 10,544.79 | 20,371.10 |
| Total | $24,342.63 | $20,656.81 | $13,810.94 | $22,257.60 |

Upon examination and audit of plaintiff's federal income tax liability for the calendar years 1947 through 1950, such amounts opposite "Total" in the above schedule were allowed as credits against plaintiff's federal income taxes for each of the years shown. A second examination and audit resulted in the same allowances.

Subsequent to the second audit and examination of plaintiff's federal income tax liability for such years and during March of 1957, the Internal Revenue Service disallowed as a credit against plaintiff's federal income taxes those amounts set opposite Title V in the schedule for each of the years designated in the schedule. The amounts set opposite Title II in the schedule were allowed as a credit against plaintiff's federal income taxes for the years designated. In addition, the amounts set opposite Title V in the schedule were allowed as deductions

To be entitled to the credit, the taxes paid must have constituted taxes paid in lieu of a tax upon income, war-profits, or excess-profits within the meaning of Sec. 131(h) of the 1939 Code.

Treasury Regulation 118, Sec. 39.131 (h)–1(b), now Reg. Sec. 1.903 provides that the term "income, war-profits, and excess-profits taxes" includes a tax imposed by a foreign country if:

1. The country has in force a general income tax law.

2. The taxpayer claiming the credit would, in the absense of a specific provision applicable to such taxpayer, be subject to such general income tax.

3. Such general income tax is not imposed upon the tax-payer thus subject to such substituted tax.

If taken in its plain meaning, the Treasury Regulation would seem to preclude a tax credit in the instant case

since the amount paid the Philippine government was assessed under two different titles of the Philippine Code. Part of the tax was paid pursuant to Title II (Income Taxes), for which the taxpayer was properly allowed a credit. The remaining amount was paid pursuant to Title V (Privilege Taxes on Business and Occupation), for which the taxpayer was allowed a deduction. It is for this latter sum that the plaintiff claims a credit.

■■ Irrespective of the name of the title under which a foreign tax is levied, credits for purposes of Section 131 are determined by revenue laws and court decisions of the United States and not by the label of foreign taxing authorities. Motland v. United States, 192 F.Supp. 358. Whether the foreign tax is the substantial equivalent of an income tax as that term is understood in the United States is the proper inquiry. Commissioner of Internal Revenue v. American Metal Co., 2nd Cir., 1955, 221 F.2d 134.

In the case of Compania Embotelladora Coca-Cola, S.A., v. United States, 139 F.Supp. 953, 134 Ct.Cl. 723, taxpayer sought a credit for production taxes paid the Cuban Government, in addition to the credit allowed him for taxes on capital and income taxes paid. The Court of Claims held in favor of the taxpayer on the grounds: "The plaintiff paid the income taxes and the so-called taxes on capital and has been allowed credits for them. The plaintiff paid the production taxes in lieu of the profits tax within the meaning of section 131(h) and should accordingly be allowed credits for those taxes under section 131(a)." (139 F. Supp. at 955)

■ The ruling in the Coca-Cola case is consistent with the plaintiff's view in the case at bar. The "in lieu of" clause of section 131(h) does not necessarily require a complete substitution of the supplemental tax for the income tax. Where, as here, the administrative problem of collecting an income tax from foreign corporations leads the taxing authority to impose additional taxes as a means of bolstering the nation's income

producing revenue, it is the duty of the taxing authorities in this country to allow a credit for the additional tax if it is in the nature of an income, war-profits, or excess-profits tax as those terms are understood in this country.

The court must therefore, consider whether the tax imposed by the Republic of the Philippines under Title V is the "substantial equivalent" of an income or excess-profits tax.

■ That it should be so construed is evident from the history of Sec. 131 of the Internal Revenue Code. Enacted by Congress to relieve domestic corporations subject to foreign taxation from being twice burdened, the "in lieu of" clause was added in 1942 to make allowances for changes in the structure of foreign taxation. In Northwestern Mutual Fire Ass'n v. Commissioner of Internal Revenue, 9th Cir., 1950, 181 F.2d 133, the taxpayer sought a credit for Canadian taxes levied at 3% upon "net premiums" of certain mutual insurance companies of which group it was a member. During the taxing period in question Canada had an income tax law to which the taxpayer was not subject. Discounting the Commissioner's contention that the foreign tax must have some relation to profit before taxpayer is entitled to the credit, the court made the following comments: "The report of the Senate Finance Committee on proposed § 131(h) expressly states that foreign taxes measured by 'gross sales' would constitute a credit. * * * Manifestly gross sales have no relation to profits. Gross sales are however analogous to 'net premiums.'" (At 135) The Philippine tax in question is on "gross receipts" and should likewise be analogized to gross sales. It follows that the plaintiff is entitled to claim as a credit taxes paid the Philippine Government pursuant to Title V of the Philippine National Internal Revenue Code.

## IV.

### ALABAMA STATE TAX

■ Subsequent to the filing of plaintiff's Alabama State and Federal In-

come Tax Returns for the years 1947 through 1949, an adjustment in certain items of income and deductions was made by federal revenue agents as a result of which plaintiff's taxable income for each of those years was increased. The final amount of such adjustment is partially dependent upon the outcome of this litigation. Plaintiff is claiming a deduction, for federal income tax purposes, of an amount equal to the additional Alabama State tax owed, but not yet paid, for each of those years, because of the increase in taxable income resulting from the adjustments.

Plaintiff filed timely Alabama income tax returns for the years 1947 through 1949, and paid the amount shown to be due thereon. On its federal tax returns for the years 1947 through 1949, plaintiff deducted these amounts and the Commissioner of Internal Revenue has allowed these deductions.

An examination and audit of plaintiff's books took place in 1954, resulting in an increase in plaintiff's taxable income for each of the years 1947 through 1949. Pursuant to its usual method of accounting, plaintiff then accrued these increases on its books for each of the years, and also accrued the additional amounts of Alabama State income taxes owed resulting from such increases. Plaintiff and representatives of the Internal Revenue Service entered into an informal agreement that the adjustments, shown in a Revenue Agent's Report dated February 9, 1955, were correct. Upon review of the items of adjustment and the informal agreement, the Internal Revenue Service revoked and reversed parts thereof and affirmed the remaining portions. Those portions which the Internal Revenue Service agreed to on review are set forth in a second Revenue Agent's Report dated December 5, 1955.

Among the items missing from the second Revenue Agent's Report were the deductions for additional Alabama taxes, and such items constitute the issue here in question.

It is well settled that where the deduction claimed is the subject of litigation, it may not properly be accrued for a taxable year prior to a determination of the litigation. Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538; Dixie Pine Products v. Commissioner, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270. By maintaining this action to recover federal taxes paid, plaintiff is in effect denying liability for further Alabama State taxes. Should plaintiff be successful in any of its claims here, the amount due the State of Alabama would be proportionately reduced. Therefore, the amount of Alabama State tax due, being a contingent sum, may not be deducted from plaintiff's income for the years 1947 through 1949.

Plaintiff argues that it is entitled to a deduction for Alabama State taxes in an amount equal to the tax due on those items contained in the Revenue Agent's Report dated December 5, 1955, over which there is no dispute. Plaintiff freely admits that such items increase its taxable income for the taxable years in question, and that as a consequence it owes additional Alabama State taxes. The testimony shows plaintiff offered to pay the taxes to the State, but that such offer was declined until the matter is "completely resolved".

It is the contention of plaintiff that since it admits liability for additional taxes as to these amounts, the Lucas rule is inapplicable. With this I do not agree. The Tax Court has said:

"We do not agree with petitioner's contention that the 'contested tax' rule is applicable only in cases where the dispute has been carried to the courts. In our view, it is sufficient if the taxpayer does not accrue the items on its books and denies its liability therefor. The rule is well settled that taxes accrue when all events have occurred that fix the amount of the tax and determine the liability to pay it." Great Island Holding Corp. v. Commissioner, 5 T.C. 150, at 160.

These additional taxes which plaintiff now seeks to accrue for the years 1947 through 1949, were not omitted through

oversight or error, but were the direct result of a deliberate and affirmative claim to the income and deduction allowances as established by the plaintiff. Plaintiff made the same claims on its State tax returns and such claims have the effect of denying additional tax liability therefor. See Gunderson Bros. v. Commissioner, 16 T.C. 118, at 126.

It is my opinion that plaintiff is not entitled to accrue and deduct in computing its net taxable income for the years 1947 through 1949, the additional Alabama State tax which it admitted owing for the first time on December 5, 1955, nor for the additional Alabama State tax the amount of which will be determined by this law suit.

V.

### SECTION 9 DEPRECIATION

This issue raises the question as to what are the proper bases for purposes of computing depreciation during the years 1947 through 1950, under Section 113 of the Internal Revenue Code, on eighteen vessels purchased by the plaintiff prior to 1946, the purchase price of which was subsequently adjusted under the Merchant Ship Sales Act of 1946.

At various times during the years 1942 through 1946, plaintiff purchased eighteen C–2 cargo vessels from the United States Maritime Commission (hereinafter referred to as Maritime), pursuant to Section 509 of the Merchant Marine Act 1936, 49 Stat. 2000, 46 U.S.C.A. § 1159. The total purchase price of the vessels was stipulated to be $49,582,767.-02. Of this amount $6,449,107.02 was paid in cash, $2,609,600.00 was paid through a trade-in allowance on four vessels, and the remaining sum of $40,524,-060.00 was secured by mortgages on the vessels. From the dates the vessels were purchased through March 7, 1946, plaintiff made cash payments totaling $9,786,-339.19 in reduction of the mortgage indebtedness, leaving a balance due on the mortgage as of March 8, 1946, of $30,-737,720.81.

As of March 7, 1946, the bases of the eighteen vessels as claimed by the plaintiff and approved by the Internal Revenue Service totaled $47,149,043.42. These bases were agreed upon as a result of adjustments in the total purchase price to account for unrecognized gain on the four vessels traded in.

On March 8, 1946, Congress enacted the Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S.C.Appendix §§ 1735–1746 (hereinafter referred to as the Act). Under Section 4, citizens of the United States were given the right to purchase from Maritime war-built vessels at the statutory sales price defined in Section 3(d). Section 9 of the Act authorizes adjustments in purchase prices upon application to Maritime, of certain vessels sold by Maritime to citizens of the United States prior to March 8, 1946. The purpose of this section was to allow a fair adjustment in the cost of ships purchased during the inflationary war period with the cost of ships purchased under the Act. This adjustment of purchase price was to be accomplished according to the entire formula set forth in Section 9.

Plaintiff filed an application with Maritime for an adjustment in the purchase price of each of the eighteen vessels under Section 9 of the Act, and said application was approved.

On June 11, 1951, plaintiff and Maritime entered into a final agreement for a final adjustment in the price of the eighteen vessels, pursuant to Section 9 of the Act. As a result of these adjustments plaintiff's mortgage indebtedness was reduced as of March 8, 1946, by $20,468,-904.07 from $30,737,720.81 to $10,268,-816.74. The final agreement called for plaintiff to make a cash payment of $86,-037.70 as of March 8, 1946, in further reduction of the mortgage indebtedness. This cash payment was exclusive of and in addition to any benefit to plaintiff under Section 9. Adding this sum to the Section 9 adjustments leaves a total of $10,182,779.04 as the amount to which the original indebtedness was reduced as of March 8, 1946.

Plaintiff contends that pursuant to the provisions of Section 9 of the Act, the

price of the eighteen vessels was adjusted and reduced by $20,468,904.07, and that the cost, and therefore the basis of these vessels as of March 8, 1946 was $26,680,139.35, and that such sum should be used for depreciation purposes. This latter figure represents the difference between the bases agreed upon by plaintiff and the Internal Revenue Service as of March 7, 1946, supra, and the reduction in purchase price effected as of March 8, 1946, by the agreement with Maritime on June 11, 1951.

Defendant contends that pursuant to the provisions of Section 9 of the Act, the price of the eighteen vessels was adjusted and reduced to $17,997,981.84, *their statutory sales price* and the price plaintiff would have had to pay for the vessels if they had been sold by Maritime to plaintiff on March 8, 1946, and not before that date.

The more than eight and a half million dollar difference between the bases as proposed by plaintiff and as proposed by the defendant Government, equals the net charter hire credits to Maritime under Section 9(b) (6), as computed under defendant's contended interpretation of Section 9(b) (6). The defendant argues that this amount is not really a part of the cost of the vessels, and should therefore be deducted from the computed sum. This same argument was raised in Barber Oil Corp. v. Manning, 135 F.Supp. 451, and there decided in the taxpayer's favor.

The defendant sets forth several different methods of adjusting the figures to arrive at its alleged basis. But permeating this issue is a single inquiry: For purposes of computing depreciation under Section 113 of the Internal Revenue Code, are the proper bases the statutory sales prices, as defined in Section 3(d), or the actual economic investment and cost after making the adjustment pursuant to Section 9(b)?

It seems to me that the Internal Revenue Service is attempting to create confusion in an area where Congress has been most explicit in setting forth the statutory procedure. The courts have spoken on this precise question in at least four cases, each one of which held adverse to the same contention now raised by the Government. Barber Oil Corp., supra; Socony Mobil Oil Company v. United States (Texaco, Inc. v. United States, and Mississippi Shipping Company, Inc. v. United States), 287 F.2d 910 (rehearing denied, 289 F.2d 326).

Section 9 of the Act is not a tax statute and it does not purport to provide the tax bases of vessels whose purchase prices have been adjusted thereunder. The tax bases of the eighteen vessels must be determined under the Internal Revenue Code. Sections 23(n) and 114(a) thereof provide for the allowance of depreciation computed on the basis of the property as determined under Section 113. Section 113(a) sets forth the general rule applicable to the present case as follows: "The basis of property shall be the cost of such property * *."

Defendant insists that it was the intention of Congress that the price effected by the adjustment be equal to the statutory sales price. This contention was well considered in Socony Mobil Oil Co. v. United States, supra, and there the Court of Claims, speaking through Judge Madden, made this comment:

"Neither the express terms of the statute, those terms in their context, nor the relevant legislative history indicate a legislative intent that the basis for depreciation of the ships should be an artificial, legally constructed figure different from their actual mathematically computed cost." (At 914)

It seems improbable that if Congress had intended the Section 9 adjustments to equal the statutory sales price, it would have omitted a reference in Section 9 to Section 3(d), which defines the statutory sales price. Indeed, the legislative history as discussed in Socony Mobil Oil indicates that this idea was considered by the drafters of the statute but dropped from the law as it now stands. The omission from the bill, as enacted, of a proposed Section 9(e) (1), which would have established the statutory sales price

as the basis for tax purposes, clearly negates defendant's arguments.

I agree with plaintiff that the cost basis in the instant case can best be determined by comparing the economic cost of the vessels to the plaintiff the moment before and the moment after the Act became effective. The parties have stipulated that plaintiff's economic investment in the vessels as of March 7, 1946, was $47,149,043.42. The parties also stipulated that as a result of section 9 adjustments the original mortgage indebtedness was reduced $20,468,904.07. This latter sum, plus a cash payment of $86,037.70 as of March 8, 1946, left an outstanding mortgage indebtedness of $10,182,779.04 on March 8, 1946.

The court finds the plaintiff's economic investment in these vessels, and consequently its cost basis of the vessels as of March 8, 1946, to be $26,680,139.35, computed as follows:

| | |
|---|---|
| Outstanding Mortgage Indebtedness ....... | $10,182,779.04 |
| Cash Payment on March 8, 1946 ........... | 86,037.70 |
| Adjusted Bases of Vessels Traded In ...... | 175,876.40 |
| Total Cash Paid up to March 7, 1946 ...... | 16,235,446.21 |
| Total economic cost to plaintiff | $26,680,139.35 |

On September 28, 1948, plaintiff sold one of the vessels ("WARRIOR") which was purchased prior to 1946, and the basis of which, for depreciation, is involved in issue here. The court finds that the sum of $26,680,139.35 is to be used by plaintiff in computing its depreciation deduction for 1947 and that part of 1948 prior to the sale of the Warrior, and that the sum of $25,902,565.91 is to be used by plaintiff in computing its depreciation deduction for that portion of tax year 1948 after the sale of the Warrior and for the tax years 1949 and 1950.

VI.

GOVERNMENT'S COUNTER-
CLAIM

The counterclaim of the Government alleges that certain adjustments in the purchase price of the eighteen vessels, discussed in Issue V, were improperly made.

█ To better understand the nature of this issue it is necessary to describe the manner in which the construction and sale of these vessels was to be accomplished. Under authority given to it in Sections 501, 502 and 509 of the Merchant Marine Act 1936 (46 U.S.C.A. §§ 1151, 1152 and 1159), the Maritime Commission, acting for the Government, would enter into a contract with a shipbuilder to construct a vessel or vessels. Pursuant to the contract, the Government would make progress payments periodically during the construction process, which payments were applied toward the cost of the vessel to the Government. Concurrent with entering into such contract, the Government was authorized to enter into a contract for the sale of the vessels to approved applicants, plaintiff being one of such.

Section 502(c), (46 U.S.C.A. § 1152 (c) ), required the applicant (plaintiff), as part of the contract of purchase, to make certain cash payments at the time progress payments were made and to pay interest at the rate of $3\frac{1}{2}\%$ per annum on that portion of the construction progress payments paid by the Government to the shipbuilder which were chargeable to the applicant and which were not reimbursed to the Government at the time of payment. If the Government was immediately reimbursed by the plaintiff for progress payments paid, no interest would accrue. The ultimate price paid for the vessel by the applicant is therefore partially dependent on when such progress payments were paid. Thus it is seen that the Merchant Marine Act of 1936 has to do with *the construction and sale of vessels*.

The Merchant Ship Sales Act, 1946, provides for certain *adjustments to be made in the purchase price of vessels* purchased from the Government before 1946. Section 9(b) (1) states in part that "the Commission shall credit the applicant with the excess of the cash payments made upon the original purchase price of the vessel * * *."

The first question to be decided is whether the phrase "original purchase price" as used in Section 9(b) (1) includes the statutory interest on progress payments paid by plaintiff to the Government.

The Government argues that the interest by its nature was the price paid the Government for the use of the money which it advanced to the shipbuilder to cover that portion of the progress payments on the vessels which were payable by plaintiff but loaned to plaintiff by the Government, and consequently not part of "original purchase price". With this I do not agree.

It is without question that up to the time of this lawsuit both of these parties considered the interest on progress payments to be a part of the original purchase price of the vessels. Each of the purchase contracts provides for and defines the purchase price of the vessels in a separate article which article includes such interest as part of its definition. In addition, the contracts contain a provision that the determination by the Commission of the purchase price shall be final and conclusive on the parties. The vessel mortgages given by plaintiff recite as consideration for the sale of the vessel a sum which includes interest on progress payments. Correspondence between Government agencies referred to the purchase price as stated in the mortgage. The final agreement (discussed in the Section 9 depreciation issue supra) entered into between Maritime and plaintiff states that the total purchase price of the vessels was $49,582,767.02, which sum includes total interest on progress payments of $705,321.54. Moreover, it appears that the Internal Revenue Service considered the interest on progress payments to be part of the purchase price of the vessels for tax purposes prior to the adjustments here in question. Finally, the evidence shows that of the 264 vessels sold prior to March 8, 1946, which were eligible for adjustment under Section 9, Maritime treated interest on progress payments as part of the original purchase price on all such vessels.

It is the contention of the defendant, in Paragraph 54(a) of its Counterclaim, that in determining the amount of the adjustment in the purchase price of the eighteen vessels under Section 9 of the Act, Maritime erroneously determined the amount of the cash payments made upon the original purchase prices of the vessels for the purpose of computing the credit to the plaintiff pursuant to Section 9(b) (1). Defendant insists that the determination by Maritime of the cash payments made upon original purchase prices was in violation of the statutory pricing formula, and therefore without authority of law. When the United States enters into a contract with a private firm or individual, the rights and duties of the parties are governed by the law applicable to contracts between private firms and individuals. The Government, however, contends that this is not the case here, as the matter comes under the exception to the above rule, namely, that the United States is not bound by the provisions of a contract entered into by an officer or agency of the Government where such officer or agency enters into the contract pursuant to a specific statute, and the provisions of such contract violate such statute.

Section 9 of the Act does not define the term "cash payments made upon the original purchase price of the vessel". Section 9 simply provides that the amount of such "cash payments made upon the original purchase price of the vessel" be used in computing certain credits in the statutory price adjustment formula. Plaintiff purchased the vessels from the Government under Section 509 of the Merchant Marine Act of 1936 (46 U.S.C.A. § 1159) and pursuant to purchasing contracts between the plaintiff and the Government. The purchasing contracts provide that the purchase price of each vessel includes interest on progress payments. They further provide that the determination by the Commission of the purchase price shall be final and conclusive on the parties. Section 9 of the 1946 Act does not provide for the sale or purchase of vessels, but simply for an

adjustment in the purchase price of certain vessels purchased prior to the date of the Act. Consequently, the final agreement pursuant to Section 9 is not a contract of sale or purchase. It simply establishes, by the application of a prescribed formula, the amount of the adjustment to be made in the original purchase price of the vessels. The original purchase price was agreed to and established by the original purchase contracts. The final agreement supersedes the purchase contract only to the extent that the original purchase prices of the vessels are adjusted in the final agreement. The final agreement is simply a fulfillment of the existing contractual relations under the purchase contracts.

There is no contention made by the Government that the purchase contracts were in violation of Section 509 of the Merchant Marine Act of 1936, pursuant to which they were made. The purchase contracts and the final agreement having violated neither act, this *litigation is* taken out of the exception and the contract is made binding upon both parties. It seems to me that the matter comes squarely under the case of Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434, in which Mr. Justice Brandeis states:

> "The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment. United States v. Central Pacific R. Co., 118 U.S. 235, 238 [6 S. Ct. 1038, 30 L.Ed. 173]; United States v. Northern Pacific Ry. Co., 256 U.S. 51, 64, 67, [41 S.Ct. 439, 65 L.Ed. 825]. When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals. * * * Punctilious

fulfillment of contractual obligations is essential to the maintenance of the credit of the public as well as private debtors. * * *" (292 U.S. at 579–580, 54 S.Ct. at 843–844)

Defendant says that regardless of the answer to the preceding question (meaning of "original purchase price"), Maritime was unauthorized by the 1946 Act to credit plaintiff with interest on interest paid on the progress payments. Section 9(b) (5) requires only that in computing the amount to be credited, the date of delivery is to be taken as the time when interest begins to accrue. That section does not prohibit interest credits on payments made prior to delivery. Since such payments were on a part of the original purchase price, the credits were properly included in the computations.

■ The next contention made by the Government in its counterclaim is that the application of the excess credits due plaintiff under Section 9(b) (8) of the Act against the mortgage indebtedness of plaintiff to Government, rather than a payment in cash to plaintiff in such amount, and the retroactive application of such credit in reduction of plaintiff's mortgage indebtedness from June 11, 1951, the date of the final agreement, to March 8, 1946, the effective date of the Act, deprived the Government of the interest due it on the amount of such reduction in mortgage indebtedness during such period, which was contrary to and not intended by the Act. This raises two questions: Did the Act require a cash payment for such excess credits or did it allow a reduction in any mortgage indebtedness in the amount of such credits? If the latter, was the retroactive application of such credits to a reduction of plaintiff's mortgage indebtedness to Government contrary to the Act?

Section 9(b) (8), (50 U.S.C.A. § 1742 (b) (8)), provides in part:

> "If, after making such subtractions, the sum of the credits in favor of the applicant exceeds the sum of the credits in favor of the Commis-

sion, such excess shall be paid by the Commission to the applicant. * * Upon such payment by the Commission * * *, such overpayments shall be treated as having been refunded * * *."

I find nothing in this section which requires a cash payment and this was the administrative interpretation of the agency charged with administration of the Act. (Hearings Before the Sub-Committee of the Committee on Appropriations, House of Representatives, 80th Congress, 1st Session, on the Independent Offices Appropriation Bill for 1948, Part 2, printed in 1947 by the United States Government Printing Office for the use of the Committee on Appropriations, page 775, et seq.). However, the entire matter was put at rest by the provisions of the Independent Offices Appropriation Act, 1948, 61 Stat. 585. Not only is there no valid reason which would preclude the parties to the final agreement from electing to treat the credit in the manner chosen, that is, reducing the mortgage indebtedness, but this 1948 Act prevented applicants who otherwise owed the Government from getting a cash rebate as a result of Section 9(b)(8). National Bulk Carriers v. Warren, 82 F.Supp. 511.

Of greater significance is the fact that the credit was applied retroactively from the date of the final agreement (June 11, 1951) to the date of the Act (March 8, 1946). The Court of Claims has spoken on this precise question in New York and Cuba Mail Steamship Co. v. United States, 172 F.Supp. 684, in the following language:

"The date of the Act was March 8, 1946. As we have seen, the plaintiff filed its application for adjustment in May 1946. The adjustment was not finally computed and embodied in the adjustment contract until January 5, 1950. The plaintiff and the Commission, in their computations and in the agreed adjustment, credited the plaintiff with the amounts to which it was entitled to credit, as of March 8, 1946. That meant, of course, that those sums were credited as partial payments on the plaintiff's mortgages as of that date, and that interest accrued to the Government thereafter only on the thereby reduced balances of the mortgages. The Government says that the balances of principal should not have been reduced until the 1950 date when the adjustment was finally agreed to. The Government's argument would distinguish, because of differences in the text, between different items in the list of adjustments, so far as their effective dates are concerned. This opinion is already too long, and the intricacies of this argument will not be discussed. The purpose of the statute seems to us quite plain. If the plaintiff had bought these used ships for the first time in 1946, the Government would have received in 1946, in cash, or in a mortgage, only the sales price of the used ships. Since the plaintiff had in 1943 paid, or given mortgages for the higher prices of the then new ships, and since such purchasers were, under section 9, to be treated like 1946 purchasers, we think Congress did not intend that such purchasers should go on, for several years after 1946, paying interest on the larger amounts which they had promised to pay in 1943." (At 688).

I agree with this interpretation of the Act, and hold that it was entirely proper in the instant case to retroactively apply the credits.

 The final question in this issue is whether the plaintiff was granted a double credit on a portion of certain trade-in allowances which were applied in payment of interest on construction progress payments. The interest of 3½% charged by the Government on the progress payments made by it to the shipbuilders was, as this Court has determined in disposing of the first issue raised by the Government's counterclaim, properly included as a part of the original purchase price of the vessel under

the vessel purchase contracts. Payments by the plaintiff of such interest, whether made in cash or by trade-in allowances, represent payments by the plaintiff on the original purchase price of the vessels, and for all such payments plaintiff was entitled to full credit in computing the adjustments under Section 9 of the Ship Sales Act. It is immaterial whether such payments were made in cash or by trade-in allowance.