The Portuguese-American Tin Company v. Commissioner.
Portuguese-American Tin Co. v. Commissioner
Docket No. 110785.
United States Tax Court
1943 Tax Ct. Memo LEXIS 251; 2 T.C.M. (CCH) 270; T.C.M. (RIA) 43287; June 15, 1943
*251 Scott C. Lambert, Esq., 225 Bush St., San Francisco, Calif., and Sigvald Nielson, Esq., 225 Bush St., San Francisco, Calif., for the petitioner. Harry R. Horrow, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: This proceeding involves a deficiency in income tax for the calendar year 1939 in the amount of $1,694.93. The sole issue is whether the Commissioner erred in disallowing a bad debt deduction in the amount of $14,217.49, claimed by petitioner in its income tax return, and in treating the amount as a capital loss, deductible, under the provisions of section 117 (d) (1) of the Internal Revenue Code, in the amount of $2,000. Findings of Fact The petitioner is a Delaware corporation with its principal office at 351 California Street, San Francisco, California. Its income tax return for the taxable year was filed with the Collector of Internal Revenue at San Francisco. During the period here in question petitioner was a subsidiary of Yuba Consolidated Gold Fields Company, hereinafter referred to as Yuba, with offices in Boston, Massachusetts. Yuba had another subsidiary known as the Capital Dredging Company, hereinafter referred to as *252 Capital. Prior to 1937, petitioner had made advances to persons and corporations, referred to herein as the "Hammon Interests", in the amount of $67,783.92. $22,594.64 of this amount was written off of the books of petitioner in 1933 and claimed and allowed as a bad debt deduction on its income tax return for that year. The balance (except $1.00), amounting to $45,188.28, was claimed and allowed as a bad debt in 1937. Advances had also been made to the "Hammon Interests" by Yuba and Capital. On April 2, 1937, Yuba, petitioner, and Capital acquired all of the stock of the Sacramento Valley Packing Company, hereinafter referred to as Sacramento, a corporation controlled by the Hammon Interests and engaged in the business of canning fruits and vegetables, in partial satisfaction of the indebtedness of the Hammon Interests to those corporations. The stock of Sacramento was divided among petitioner and its affiliate in the proportion that the unpaid indebtedness of the Hammon Interests to each bore to the total indebtedness owing to them, except that the total indebtedness did not include an amount of $25,000 owed by Sacramento to Yuba, which was secured by a first mortgage on its plant. *253 Yuba received 60 percent of the Sacramento stock, petitioner received 33 percent and Capital received 7 percent. The stock received by petitioner was entered on its books at $1. F. C. Van Deinse, a director and officer of petitioner, was a director of Sacramento and became its president about 1937. He was also an officer and western representative of Yuba. When taken over by petitioner and its affiliates Sacramento had a carry-over of several thousand cases of tomatoes. It did not, however, have sufficient cash or liquid assets to finance a season's pack. It had capital assets or a plant which had cost it approximately $250,000. It owed Yuba $25,000 secured by the mortgage as referred to above and it also owed $15,000 to the Pacific Can Company. Van Deinse thought that Sacramento's lack of success had been due to its small, limited pack and to its policy of selling through a broker. He thought that a pack of about 300,000 cases, including peaches, apricots, pears, and spinach, if marketed direct through its own sales organization would be profitable, and that Yuba would be justified in utilizing some of its funds in carrying on the business of Sacramento rather than investing them *254 in stocks and bonds of corporations over which it had no control. In a telegram to Stanley M. Bolster, president of Yuba, Van Deinse advised him that Sacramento would require about $28,000 additional working capital to finance the contemplated pack. He suggested that Yuba advance $12,000 of this amount, that petitioner advance $13,000 and that Capital advance $3,000. These amounts were approximately in proportion to the stock ownership of the corporations in Sacramento, considering in this connection the unsecured advances by Yuba amounting to approximately $12,000. Bolster agreed to the plan for 1937, but stated that Yuba was not enthusiastic about carrying on the packing business. Additional funds necessary for the purchase of green fruits, sugar and supplies were arranged for from the California bank, its loan to be secured by a 65 percent lien on the warehouse receipts. Pacific Can Company agreed to extend credit on open account up to $12,000 and furnish all required cans, accepting as security a second lien on the warehouse receipts. In April 1937 Sacramento delivered to Yuba promissory notes in the aggregate amount of $11,862.50 bearing interest at 5 percent and payable one *255 year after date covering prior unsecured advances. It also delivered to Yuba a note in the amount of $7,000 to cover the sum paid to it in April, 1937. Capital paid Sacramento $1,000. Petitioner paid Sacramento $4,000, accepting its promissory note in that amount dated April 21, 1937, and payable in one year with interest at 5 percent. Thereafter petitioner advanced [1] additional sums to Sacramento and received notes therefor as follows: Amount
Date Advanced
Date Due
Interest Rate
$ 5,000.00
June 30, 1937
June 30, 1938
5%
4,200.00
July 28, 1937
July 28, 1938
5%
2,000.00
Feb. 28, 1938
Six months after date
5%
1,000.00
Apr. 30, 1938
Six months after date
5%
300.00
May 31, 1938
Six months after date
5%
$12,500.00
About the same time that the advances referred to above were made by petitioner, Yuba and Capital also made advances to Sacramento in proportion to their relative stock holdings in it and accepted additional promissory notes. All of the notes were unsecured. Due to unforeseen conditions *256 the pack for the 1937 season was less in quantity and substantially higher in cost than anticipated When the season closed Sacramento had a large, slow-moving, carry-over in its inventory, it did not realize any profits and it had no available cash with which to pay off the advances of petitioner and its affiliates. As a result it did not attempt to resume packing operation in 1938. Efforts were directed toward liquidating the inventory to the end that funds for the liquidation of its indebtedness might be secured. In July 1938 the plant was leased to Clark and Hollenbeck (Thornton Canning Company) at a minimum of $10,000 for 1938 and $15,000 for the remaining years, with an option to purchase the plant for $100,000. The price of canned goods declined in the latter part of 1937 and in the early part of 1938 canned peaches were selling for less than cost. In the spring of 1938 the selling price of canned goods was hardly sufficient to liquidate the 65 percent bank loan, and the 15 percent security of Pacific Can had disappeared due to market conditions. At a meeting of the board of directors of Sacramento held on January 3, 1938, a loan of $10,000 from the Bank of California was *257 authorized to take care of unsecured indebtedness growing out of 1937 operations. The bank indicated a willingness to lend the amount desired on the security of the warehouse receipts which it then held provided payment was guaranteed by Van Deinse. The loan was made and the guaranty was given. On February 20, 1939, Sacramento entered into an agreement for the sale of its assets, other than inventory, to the Pacific Can Company. Under the terms of this agreement Pacific agreed: (1) to purchase the mortgaged indebtedness of Sacramento to Yuba; (2) to cancel all the existing indebtedness of Sacramento to it, however evidenced; and (3) to assume payment of San Joaquin County taxes of approximately $4,309.45. The total consideration paid by Pacific Can Company amounted to approximately $84,000. The agreement referred to in the preceding paragraph provided that the indebtedness of Sacramento to the Bank of California would be liquidated from the net proceeds of the sale of canned goods and the balance of the proceeds from such sale, after deducting certain expenses and warehouse charges, were to be disbursed on the basis of 60 percent to Pacific and 40 percent to Sacramento, provided, *258 however, that the amount received by Sacramento should not exceed $2,500. At the time of the sale to Pacific on February 20, 1939, Sacramento owed petitioner $16,500 evidenced by unsecured notes. Of this amount Sacramento paid petitioner $2,283.51 which was credited on petitioner's books against the note of April 20, 1937, for $4,000. The amount due under all of the notes after this credit was made was $14,216.49. In the letters of Van Deinse to the president of Yuba and in the resolutions of the board of directors the advances or payments to Sacramento were referred to as loans or "borrowings". They were never referred to by any of the parties as capital advances. It was always the understanding that interest-bearing promissory notes should be issued for the amounts advanced or paid and this was always done.- The following notations appear on petitioner's ledger relative to the Sacramento notes: "December 1, 1938. Notes not yet renewed. Matter taken up with Mr. Gorman and he suggests either a renewal of the notes or a provision should be set up which will take care of the eventuality." "July 18, 1939. Since the Sacramento Valley Packing Company is sold and liquidated notes will *259 be written off end of 1939." The balance sheet of Sacramento as of December 31, 1938, was as follows ASSETS
CAPITAL INVESTMENT
Real Estate
$ 5,444.25
Buildings & Improvements
$121,132.52
Machinery & Equipment
157,296.33
278,428.85
Less: Depreciation Reserve
182,077.98
96,350.87
$101,795.12
CURRENT ASSETS
Cash in Bank
2,337.00
Accounts Receivable
3,692.33
Notes Receivable
1,500.00
Shipping Cases, Cans, etc.
1,521.78
Canned Goods
32,755.16
41,806.27
DEFERRED CHARGES
Organization Expenses
5,467.60
Prepaid Insurance
1,046.54
6,514.14
DEFICIT
264,758.84
$414,874.37
LIABILITIES
CAPITAL STOCK
$250,500.00
MORTGAGE DEBT
48,750.14
CURRENT LIABILITIES
Accounts Payable
$ 11,010.28
Notes Payable
104,613.95
115,624.23
$414,874.37
The canning business is a rather speculative industry. Prices depend upon a variety of factors. A short crop or a frost will frequently raise the market price while an over-pack tends to lower the price. On December 31, 1938 it could not be determined how much would be realized from the 23,546 cases of canned goods which Sacramento then had on hand nor what sum could be realized *260 from the sale of its assets. Petitioner kept its books and filed its income tax returns on the accrual basis. It did not accrue on its books or include in its income tax returns any interest received in respect to the Sacramento notes. No interest was paid on any of the notes. Sacramento, on its books, accrued interest on the notes given to petitioner; but it did not deduct any of the interest on its returns for the years 1937, 1938 and 1939. No net income was shown in any of the returns filed by it for those years. In its income tax return for 1939 petitioner claimed a bad debt deduction of $14,217.49 [2] on the advances to Sacramento. Respondent disallowed the claimed deduction as a bad debt. He treated the advances to Sacramento as contributions to capital and the $14,217.49 as a capital loss, limited under the applicable law to $2,000. The advances or payments made by petitioner to Sacramento in 1937 and 1938, *261 evidenced by promissory notes aggregating $16,500, were loans and not contributions to capital. The difference between the face amount of the notes and the payments made on them in 1939 aggregating $2,283.51 or $14,216.49 was a debt which became worthless in 1939. Opinion The petitioner contends that its advances or payments to Sacramento in the amount of $16,500 were loans and that the unpaid balance became worthless in 1939. Finding to that effect has been made. This is dispositive of the major issue. A brief analysis of respondent's contention and the evidence relied upon by us in making our basic finding may appropriately be made. As indicated at the outset, respondent contends that the advances were contributions to capital and constitute an investment by petitioner in the stock of Sacramento, the loss on which is subject to the limitations of section 117 of the Internal Revenue Code. He further contends, in the alternative, that even if the amounts advanced by petitioner were bona fide loans it nevertheless has failed to sustain its burden of proving that the amount claimed as a deduction became worthless during the taxable year. The applicable statutes are shown in the *262 margin: [3]
To entitle a taxpayer to a deduction for a bad debt, the debt must have had an existence in fact. The relation of debtor and creditor arises where one, by contract or law, has become liable or bound to pay another an amount of money, certain or uncertain. It must be an outstanding obligation. Birdsboro Steel Foundry and Machine Co. v. United States, 78 Ct. Cl. 100. "Debt" has been defined as "a sum of money due either by certain and express agreement or established by a judgment of court as a debt of record," Funk and Wagnalls New Standard Dictionary; "An unconditional promise to pay a fixed sum at a specified time." Black's Law Dictionary, citing 281 S.W. 968-972; "A sum of money due under contract express or implied" Cyclopedia Law Dictionary, Third Ed. P. 311. The evidences of a debt, as so defined, have been recognized by the courts in many cases. It is trite to remark that a transaction, which apparently gives rise to the relationship of debtor and creditor, may not in fact do so. An advancement for purposes of investment is, of course, such a transaction. Cf. Hoefle v. Commissioner, 114 Fed. (2d) 713 (25 A.F.T.R. 703), *263 Paul Cavanagh, 42 B.T.A. 1037, Max Thomas Davis, 46 B.T.A. 663. The question whether a debt has actually been created or exists is one of fact to be determined in the light of all the circumstances surrounding the transaction. Cf. Philip H. Schaff, 46 B.T.A. 640. *264 From the facts in the present record it appears that Sacramento possessed a well equipped plant, which in 1936 had turned out less than its capacity in canned fruits and vegetables. Van Deinse, who became its president in 1937, was of the definite opinion that a capacity pack would be profitable. He consulted with Rodegerdts, executive vice president of Pacific Can Company, who had the same idea. Arrangements were made with the California Bank to finance the pack up to 65 percent of the market value, and with Pacific to extend credit for cans up to 15 percent, both to be secured by warehouse receipts. Pacific had also agreed to extend $12,000 credit on open account. Van Deinse estimated that an additional $28,000 would be required for operations; and upon his request this amount was advanced by petitioner and its affiliates. Petitioner advanced $13,200 and received from Sacramento its promissory notes payable in one year and bearing interest at 5 percent. It was later found that the estimated requirement of $28,000 had been too low and in the early part of 1938 petitioner advanced $3,300 receiving therefor Sacramento's promissory notes payable six months from date and bearing interest *265 at 5 percent per annum. These advances were treated as loans on the books of both companies, were referred to as loans by Van Deinse in his correspondence, and were so characterized by the boards of directors of both companies. After the sale of the packing plant in 1939 proceeds from the sale of canned goods in the amount of $2,283.51 were paid to petitioner and credited upon its books against the note of April 20, 1937. From these and other facts in the record it has been found as a fact that the advances were loans and not contributions to Capital. The finding, we think, is amply justified. As is usually true in controverted issues of fact there are circumstances tending to support a contrary view. Respondent's determination stems largely from the fact that petitioner, Yuba and Capital owned all of the stock of Sacramento and that the advances were made by each in proportion to stock ownership. The substance of his argument is that petitioner and its affiliates were interested, as stockholders, in building up the business of Sacramento in order to increase the value of their stock; that for this reason they made advances in 1938 to meet unpaid operating costs of 1937; that they *266 did not require any real security for their advances, accrue the interest on their books, insist on a pro-rata distribution of unsecured claims, or contemplate judicial proceedings for collection; and that all of the circumstances indicate the advances were contributions to capital rather than loans. It is true that where advances are made to a corporation by stockholders in proportion to their stock ownership in it the transaction should be closely scrutinized. Such scrutiny has been given here. The mere fact that the advancements were made by stockholders is not conclusive that they were contributions to capital. If such contributions were in fact loans, as distinguished from further investments as stockholders, - and we have found that they were - then they are subject to the rules governing bad debts and deductible when worthlessness occurs. Edwin C. Hallam, 2 B.T.A. 1220; Carl C. Harris, 19 B.T.A. 895; Alfred K. Nippert, et al., 32 B.T.A. 892; Robert H. Montgomery, 37 B.T.A. 232; Harry T. Nicolai, 42 B.T.A. 899. We do *267 not understand that respondent is contesting the correctness of this rule. He, as indicated above, is contending merely that no debt was created. Having found, as we have, that a debt was created, we next consider respondent's alternative contention that petitioner has failed to sustain its burden of proving that the amount claimed as a deduction became worthless in the taxable year. The crux of his argument is indicated by the following quotation from his brief: "Partial worthlessness of debts such as are alleged by petitioner to exist in this case is allowable as a deduction only in an amount not in excess of the part which becomes worthless within the taxable year." As we view it petitioner is not claiming the deduction of a debt "recoverable only in part" in the sense that such expression is used in the Revenue Act. Looking at the situation realistically it is doing only what has been done in hundreds of cases and no doubt will be done in hundreds more. It had a debt. At the end of the preceding year the debt had become "recoverable only in part." The Commissioner, if claim for a deduction in the earlier year had been made, could have allowed the deduction "in an amount *268 not in excess of the part which * * * [became] worthless" within that year; and his allowance or refusal to make an allowance would have been reviewable by this tribunal. American Fork and Hoe Co., 33 B.T.A. 1139. But if a taxpayer has substantial reason to believe that a debt may eventually be paid in part he is under no duty to claim a deduction for partial worthlessness. Eljer Company v. Commissioner, 134 Fed. (2d) 251; Blair v. Commissioner, 91 Fed. (2d) 992; Helvering v. Ames, 71 Fed. (2d) 939. "The privilege which is given to charge off and deduct that part of a debt which is ascertained to be worthless does not deprive a taxpayer of the right to await the time when the debt becomes wholly worthless." 5 Mertens - Law of Federal Income Taxation 30.23. Although the cases cited arose under section 23(k), I.R.C. or the corresponding section of other revenue acts we believe that the same rule is applicable under section 142 of the 1942 Act, the essence of the change made by that amendment being merely to substitute actual worthlessness, in whole or in part, *269 for "ascertainment of worthlessness and charge-off" as required under the earlier acts. Moreover it may be pointed out that respondent's theory, if carried to its logical conclusion, would require every taxpayer to ascertain at its peril, at the end of each taxable year, the precise amount which would ultimately be collected upon its debts and charge-off, as a partial bad debt, the amount representing the portion which had actually become worthless. We do not believe that Congress ever intended to make any such requirement or that the language used by it is susceptible of an interpretation to that effect. Petitioner's burden, as we view it, was to show that the debt had not become worthless in a prior year, that no claim for a partial worthlessness had previously been allowed, and that the uncollected portion of the debt existing at the end of the year was then wholly worthless. Since such showing has been made the deduction should be allowed. Decision will be entered under Rule 50. Footnotes
1. No significance is to be attributed to the use herein of such words as "advanced" or "advances" They are used only to indicate that the sums were paid over.↩
2. The difference between the face amount of the notes and the payments made upon them is $14,216.49. The discrepancy may have resulted, as stated by counsel for the respondent in his opening statement, from the addition of petitioner's $1.00 investment in the stock.↩
3. INTERNAL REVENUE CODE: SEC. 117. CAPITAL GAINS AND LOSSES. (d) Limitation on Capital Losses. - (1) Corporation. - In the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of $2,000 plus the gains from sales or exchanges. * * * SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (g) Capital Losses. - (1) Limitation. - Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117. (2) Securities Becoming Worthless. - If any securities (as defined in paragraph (3) of this subsection) become worthless during the taxable year and are capital assets, the loss resulting therefrom shall, for the purpose of this chapter, be considered as a loss from the sale or exchange on the last day of such taxable year, of capital assets. (3) Definition of Securities. - As used in this subsection the term "securities" means (A) shares of stock in a corporation and (B) rights to subscribe for or to receive such shares. REVENUE ACT OF 1942: SEC. 124. DEDUCTION FOR BAD DEBTS, ETC. (a) General Rule. - Section 23 (k) (relating to bad debts and securities becoming worthless) is amended to read as follows: "(k) Bad Debts. - "(1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied in excess of the part which becomes worthless within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection." * * * * *
(d) Effective Date of Amendments. - The amendments made by this section adding the last sentence of section 23 (k) (1) and adding section 23 (k) (4) shall be effective only with respect to taxable years beginning after December 31, 1942; the amendment inserting section 23 (k) (5)↩ and amendments related thereto shall be applicable only with respect to taxable years beginning after December 31, 1941; and the other amendments made by this section shall be effective with respect to taxable years beginning after December 31, 1938.