TROOP WATER HEATER COMPANY, a corporation, and Bernard J. Hampsey, Receiver of Troop Water Heater Company, Plaintiffs,

v.

John H. BINGLER, District Director of Internal Revenue, Defendant.

UNITED STATES of America, Intervenor,

v.

TROOP WATER HEATER COMPANY, a corporation, and Bernard J. Hampsey, Receiver of Troop Water Heater Company.

Civ. A. No. 62-573.

United States District Court
W. D. Pennsylvania.
Aug. 26, 1964.

James C. Larrimer, of Dougherty, Larrimer & Lee, Pittsburgh, Pa., for Troop Water Heater Co. and Bernard J. Hampsey, receiver.

Gustave Diamond, U. S. Atty., Pittsburgh, Pa., by Edward J. Snyder, Sp. Counsel, Dept. of Justice, Washington, D. C., for John H. Bingler, Dist. Director, and United States.

MARSH, District Judge.

The defendant, John H. Bingler, District Director of Internal Revenue, disallowed plaintiffs' claims for refund of income taxes paid for years 1955 and 1956 in amounts of $6,330.23 and $12,959.32, respectively. In the present litigation the principal issue presented is whether the plaintiff taxpayer, Troop Water Heater Company (Troop), was entitled to a bad debt deduction claimed by its Receiver, also a plaintiff, in its 1957 income tax return.[1] Dependent upon the decision of this issue is whether Troop sustained a net operating loss in 1957 which may be carried back to the years 1955 and 1956 and carried forward to the years 1958, 1959, and 1960.

We think Troop was entitled to a bad debt deduction of $178,968.97 for 1957 and sustained a net operating loss of $101,242.40, which is available for use pursuant to § 172, 26 U.S.C.

The stipulated facts are so found. Other facts are found from the evidence presented.

---

1. Section 166, 26 U.S.C. provides in part:
   "(a) General rule.—
   "(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

   "(2) Partially worthless debts.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

FINDINGS OF FACT

The plaintiff taxpayer, Troop, is a Pennsylvania corporation having its principal place of business in Pittsburgh, Pennsylvania. It was engaged in manufacturing water heaters and tanks. At all times pertinent, its principal officers and directors were John Murray, treasurer, and Frank Proctor, president. From November, 1956 through May, 1957, Troop advanced money to Alabama Acceptance Corporation (Alabama), its parent corporation.

Alabama was an Alabama corporation having its principal place of business in Birmingham, Alabama. It was a loan discount company engaged in borrowing and loaning money to individuals on automobile paper. Alabama ceased making loans to individuals after November, 1957. It continued to borrow money until November, 1957. Partial repayments of borrowed funds were made up to November, 1957.

At all pertinent times, Alabama owned 81% of the stock of Troop. The remainder of Troop's common stock was owned by 35 individuals; six individuals owned its outstanding preferred stock of 310 shares.

At all pertinent times, Alabama's principal officers and directors were John Murray, president, and Frank Proctor, vice-president.[2]

Alabama was adjudicated a bankrupt on May 9, 1958. At that time it had liabilities of $1,100,162.03; its Trustee, as of December, 1963, had collected $20,492.45. Troop filed a claim against Alabama with the Referee in Bankruptcy for unpaid loans, which claim was marked unsecured and contested; it has not received any payments from Alabama's Trustee in Bankruptcy.

The plaintiff, Bernard J. Hampsey, was appointed permanent Receiver of the taxpayer by the Court of Common Pleas of Allegheny County, Pennsylvania, on August 11, 1958, and is presently acting in that capacity.

The defendant, John H. Bingler, since May 1, 1956, has been the District Director of Internal Revenue at Pittsburgh, and is the agent of the Commissioner of Internal Revenue.

Troop paid income taxes for 1955 in the sum of $6,330.23, and for 1956 in the sum of $12,959.32, to the defendant, and has duly filed claims for refund based on the alleged net operating loss carrybacks from the year 1957. The defendant disallowed the claims for refund. Troop timely filed this action to recover the income taxes paid by it to defendant in 1955 and 1956.

The income taxes for 1955 were paid by two checks, i. e., one for $1,500.00 dated March 14, 1956, and the second for $4,830.23 dated June 7, 1956. The first check was received by the defendant's predecessor on March 15, 1956, but was deposited by the defendant, Bingler, on June 8, 1956, along with the second check, making a total deposit to the defendant's credit of $6,330.23, the income tax of Troop for 1955 as computed in its return for that year.

Defendant has assessed income, excise, unemployment, and Federal Insurance Contributions Act taxes, penalty and interest, against the taxpayer for the years 1957, 1958, 1959, and 1960. All of these taxes were duly and timely assessed, notice and demand for the payment was then, there, and thereafter made, and was refused by the plaintiffs and these taxes remain unpaid. The amounts are set forth in Appendix A. These assessments are based on the disallowance by defendant of the net operating loss deduction claimed by taxpayer for the year 1957.

As of February 29, 1956, it was known that Alabama had been losing money and it continued to lose money, although for the 6-month period ending in December, 1956, according to its consolidated bal-

---

2. Other officers were John A. Murray's wife, Detelya (the parties seem to agree that Mrs. Murray's correct name is Vetelya), secretary, Carl Jinks, vice-president and loan manager, and a Mr. Newell, comptroller. The Murrays and Proctor were the directors.

ance sheet, a small profit was made. In order to do business, Alabama borrowed money from individuals and companies, including banks. In 1957, it borrowed $70,000.00 from Par Value Loan Company, repaid $5,000.00, and the balance of $65,000.00 became a worthless debt, subsequently approved by the Internal Revenue Service. Among the lenders were six other companies, including taxpayer, and about 225 individuals.

During the period from November 27, 1956, to May 24, 1957, Troop advanced a total of $308,500.00 to Alabama. As of December 31, 1957, there was a balance due by Alabama to Troop on the aforesaid advancements in the amount of $219,968.97. As of that date, this balance was uncollectible by reason of the insolvent condition of Alabama and was a wholly worthless debt. Alabama became insolvent on March 31, 1957.

The aforesaid advances were made to Alabama on the following dates:

| Date | Check No. | Amount Advanced |
|---|---|---|
| 11/27/56 | 40126 | $ 30,000.00 |
| 11/27/56 | 40127 | 30,000.00 |
| 11/27/56 | 40128 | 20,000.00 |
| 11/27/56 | 40130 | 5,000.00 |
| 12/11/56 | 40206 | 15,000.00 |
| 12/11/56 | 40207 | 5,000.00 |
| 12/19/56 | 101 | 9,000.00 |
| 12/28/56 | 40259 | 7,000.00 |
| 1/15/57 | 40338 | 10,000.00 |
| 1/17/57 | 40347 | 100,000.00 |
| 2/8/57 | 102 | 3,000.00 |
| 2/12/57 | 103 | 3,000.00 |
| 2/16/57 | 104 | 3,000.00 |
| 2/21/57 | 1 | 15,000.00 |
| 3/15/57 | 105 | 6,000.00 |
| 4/23/57 | 40679 | 5,000.00 |
| 4/23/57 | 1548 | 7,000.00 |
| 4/30/57 | 40742 | 2,000.00 |
| 4/30/57 | 1558 | 5,000.00 |
| 5/3/57 | 40744 | 5,000.00 |
| 5/7/57 | 40750 | 2,369.74 |
| 5/7/57 | 1564 | 3,630.26 |
| 5/13/57 | 40805 | 5,000.00 |
| 5/20/57 | unnumbered | 7,500.00 |
| 5/22/57 | unnumbered | 5,000.00 |
| | | $308,500.00 |

While Alabama was solvent, Troop advanced the total amount of $261,000.00 as follows:

| Date | Amount Advanced |
|---|---|
| 11/27/56 | $ 30,000.00 |
| 11/27/56 | 30,000.00 |
| 11/27/56 | 20,000.00 |
| 11/27/56 | 5,000.00 |
| 12/11/56 | 5,000.00 |
| 12/11/56 | 15,000.00 |
| 12/19/56 | 9,000.00 |
| 12/28/56 | 7,000.00 |
| 1/15/57 | 10,000.00 |
| 1/17/57 | 100,000.00 |
| 2/8/57 | 3,000.00 |
| 2/12/57 | 3,000.00 |
| 2/16/57 | 3,000.00 |
| 2/21/57 | 15,000.00 |
| 3/15/57 | 6,000.00 |
| | $261,000.00 |

While Alabama was insolvent, Troop advanced $47,500.00.

Of the total amount advanced, i. e., $308,500.00, $60,500.00 was advanced on open account; $248,000.00 was evidenced by promissory notes.

Of the $85,000.00 advanced on November 27, 1956, $80,000.00 was evidenced by demand notes, providing for 10% interest, and purporting to be secured by collateral in the face amount of $80,003.97; $26,681.48 was repaid, leaving a balance of $53,318.52. Interest in the amount of $2,050.17 was paid, the last payment being on May 8, 1957.

The advance of $9,000.00 on December 19, 1956 was evidenced by a 12-month installment note, providing for 10% interest, and purporting to be secured by collateral in the face amount of $9,043.66. The sum of $3,000.00 was repaid, leaving a balance of $6,000.00. Payments of $750.00 on principal and of $75.00 interest were made each month, the last payment being in April, 1957.

The advance of $3,000.00 on February 8, 1957 was evidenced by a 12-month installment note, providing for 10% interest, and purporting to be secured by col-

lateral in the face amount of $3,006.99. The sum of $750.00 was paid on principal, leaving a balance of $2,250.00. Payments on principal were made monthly together with interest payments of $25.00 per month. The last payment was made in May, 1957.

The advance of $3,000.00 on February 12, 1957 was evidenced by a 12-month installment note, providing for 10% interest, and purporting to be secured by collateral in the face amount of $3,006.99. The sum of $750.00 was paid on principal, leaving a balance of $2,250.00. Payments on principal were made monthly together with interest payments of $25.00 per month. The last payment was made in May, 1957.

The advance of $3,000.00 on February 16, 1957, was evidenced by a 12-month installment note, providing for 10% interest, and purporting to be secured by collateral in the face amount of $3,012.26. The sum of $750.00 was paid on principal, leaving a balance of $2,250.00. Payments on principal were made monthly together with interest payments of $25.00 per month. The last payment was made in May, 1957.

The advance of $6,000.00 on March 15, 1957 was evidenced by a 12-month installment note, providing for 10% interest, and purporting to be secured by collateral in the face amount of $6,005.05. The sum of $1,000.00 was paid on principal, leaving a balance of $5,000.00. The $1,000.00 was paid in two monthly installments, together with interest of $50.00 accompanying each installment. The last installment was paid in May, 1957.

The advances of $10,000.00 on January 15, 1957 and $15,000.00 on February 21, 1957 were evidenced by a 90-day note dated February 21, 1957 in the amount of $25,000.00, providing for interest at 6%. The sum of $14,200.00 received in June, 1957 was credited to this note, leaving a balance due of $10,800.00.

The advance of $100,000.00 on January 17, 1957, was evidenced by two demand notes without collateral, one for $65,000.00, the other for $35,000.00; the first

provided for interest at 4%, the second did not specify the rate of interest. No payments were made on these notes.

The advances on open account made on November 27, December 11, and December 28, 1956, while Alabama was still solvent, in the total amount of $32,000.00, were fully repaid by payments made in December and May, 1957.

Of the total amounts advanced by Troop to Alabama while the latter was solvent ($261,000.00), Alabama paid back $79,131.48, leaving a balance due of $181,868.52.

Of the total amounts advanced while Alabama was insolvent ($47,500.00), $6,500.00 was paid back, leaving a balance due of $41,000.00. The total balance due is $222,868.52.

The total interest paid by Alabama to Troop was $2,899.55. This sum was credited to the principal sum due as of December 31, 1957, leaving a balance due of $219,968.97.

Interest earned on Alabama's notes for the entire year 1957 in the amount of $22,737.91 was recorded on the general ledger of Troop. No interest was collected subsequent to May, 1957.

Of the bad debt deduction claimed on taxpayer's 1957 income tax return in the amount of $263,168.97, the amount of $219,968.97 represents the debt of Alabama.

On June 18, 1957, Alabama issued a note in the amount of $237,068.52 to replace all notes previously issued. The original notes were returned to Alabama. This amount of $237,068.52, adjusted to $219,968.97 (to account for $14,200.00 of additional repayments received that same month from Alabama and for the $2,899.55 of interest credited to principal on December 31, 1957), represented the total of the balances due on taxpayer's loans to Alabama.

It is doubtful that the collateral listed on the collateral notes was delivered into the possession of taxpayer, but if it was, it was returned to Alabama when all the notes were replaced by the note of June 18, 1957.

Troop did not declare or pay a dividend on its common stock for the years 1956 and 1957.

The advances made to Alabama while it was solvent were bona fide loans which, at the times they were made, Troop believed and expected would be repaid with interest.

Plaintiffs failed to sustain their burden of proof that the advances made to Alabama while the latter was insolvent were made with a reasonable expectation of repayment.[3]

## DISCUSSION

The taxpayer, Troop, has abandoned its alternative claim to an embezzlement loss deduction. The sole issue is whether it is entitled to a bad debt deduction for 1957, with respect to all or any part of the advances made by it to Alabama from November, 1956 through May, 1957.

■ Whether an advance from a subsidiary corporation to its parent corporation, the owner of a majority of its stock, is a bona fide loan for tax purposes is a question of fact and depends upon the existence of an intent at the time the advance was made that it should be paid back.[4] It is the substance rather than the form of the transactions which governs. As expressed in 1 Mertens, Law of Federal Income Taxation, § 9.21, "the important question in such cases is whether it was intended that the amount withdrawn be repaid. It is the intention at the time the withdrawals are made which is determinative; that intention cannot be changed by changed circumstances, or by subsequent or newly discovered difficulties unforeseen at the time of the withdrawals."

■ A prerequisite for a bad debt deduction under the statute[5] is a clear showing that the parties intended to create a debtor-creditor status. Considering the record as a whole, it is our opinion that the taxpayer has sustained its burden of proving that the advances it made to Alabama up to March 31, 1957, when the latter became insolvent, did create a debtor-creditor relationship; that the debts became wholly worthless in 1957; and that the taxpayer is entitled to a bad debt deduction in the amount of $178,968.97 for the year 1957.[6] Cf. Wiese v. C. I. R., 93 F.2d 921 (8th Cir. 1938), cert. denied, 304 U.S. 562, 58 S.Ct. 944, 82 L.Ed. 1529; Carl L. White, 17 T.C. 1562 (1952); Wilputte Coke Oven Corp., 10 T.C. 435 (1948); Jacksonville Paper Co., 13 T.C.M. 728, 753 (1954).

Notes were given for all these advances except for $60,500.00 which was advanced on open account. Alabama carried the advances as loans payable to Troop. Had Alabama treated the advances as dividends, its financial picture would have been considerably enhanced in 1956 and 1957, in the sense that the advances would have been carried as an addition to Alabama's earned surplus rather than as liabilities. Troop's books reflected the advances as loans and reported "interest earned" in its 1957 tax return. Interest was regularly paid by Alabama to Troop on all the loans evidenced by notes except the $100,000.00 loaned on January 17, 1957. The amount of $47,131.48 of the principal of the loans evidenced by notes issued during solvency was repaid; $32,-000.00 advanced on open account prior to insolvency was fully repaid.

---

3. Alabama made no payments on account of principal or interest on the notes given to Troop subsequent to March 31, 1957.

4. Diamond Bros. Co. v. C. I. R., 322 F.2d 725, 732 (3d Cir. 1963); C. I. R. v. Makransky, 321 F.2d 598, 600 (3d Cir. 1963); Wiese v. C. I. R., 93 F.2d 921 (8th Cir. 1938), cert. denied 304 U.S. 562, 58 S.Ct. 944, 82 L.Ed. 1529; Clark v. C. I. R., 266 F.2d 698, 710–711 (9th Cir. 1959); Chism's Estate v. C. I. R.,

322 F.2d 956, 960 (9th Cir. 1963); Carl L. White, 17 T.C. 1562 (1952); Wilputte Coke Oven Corp., 10 T.C. 435 (1948); Jacksonville Paper Co., 13 T.C.M. 728, 753 (1954).

5. See f. n. 1, supra.

6. The defendant Bingler contended that the advances were dividends but produced no affirmative evidence to support this contention.

The rate of interest on most of the notes was an attractive 10%; one note provided for 6%, one for 4%, and on one the rate of interest was not stated.

We think the advances by the taxpayer up to the insolvency of Alabama on March 31, 1957 were in reality what they appeared to be in form,—they were not sham transactions, the circumstances revealed a reasonable expectation of repayment. Even though the advances were made at a time when Alabama was incurring operating losses, Alabama entertained hopes of earning a profit [7] and expected to repay the loans. Notwithstanding its loss record, Alabama was able to secure loans from other individuals and other companies, including banks. In all the circumstances, we cannot find that Troop believed that the notes it took prior to March 31, 1957 were worthless and uncollectible. The evidence of intent to repay is ample. The loss of funds advanced by a corporation to its dominant stockholder, whether to earn attractive rates of interest or for some other reason, is to be treated as a bad debt if advanced with a reasonable expectation of repayment.

Such advances are readily distinguishable from cases cited by defendant where a shareholder made advances to his corporation under the guise of loans but was actually risking his money as capital contribution and did not contemplate repayment, e. g., Diamond Bros. Co. v. C. I. R., 322 F.2d 725 (3d Cir. 1963); Gilbert v. C. I. R., 248 F.2d 399 (2d Cir. 1957), 262 F.2d 512 (2d Cir. 1959).

We agree that the considerations expressed in cases of that type are generally applicable here. For example, in such cases where the advances have been held to be loans, it was the intent of the parties as to the nature of the transactions which was controlling, and in that respect substantial weight has been given to the accounting records of the lender and the borrower; [8] no adverse inferences have been drawn even when some of the advances were evidenced by open accounts and without interest,[9] or when the advances were made to supply a temporary shortage of working capital where there is a reasonable expectation of repayment,[10] or when the debtor is suffering losses,[11] or when the lender is the dominant shareholder of the debtor.[12]

We think that Troop's Receiver was justified in taking the notes and the books and records evincing these transactions at face value, deducting those loans made prior to insolvency as bad debts (which became worthless as Alabama's struggle against insolvency during the latter part of 1957 proved to be of no avail), and filing a claim therefor with Alabama's Trustee in Bankruptcy.

The notes involved were unconditional promises to pay, most of them at 10% interest; three were demand notes and the remainder were 12-month installment notes. They were valid and enforceable

---

7. Alabama did temporarily reverse its run of losses and showed a small profit in its consolidated balance sheet for December 31, 1956.

8. Jennings v. United States, 272 F.2d 842 (7th Cir. 1959); Maloney v. Spencer, 172 F.2d 638 (9th Cir. 1949); Rowan v. United States, 219 F.2d 51 (5th Cir. 1955); American Zinc, Lead & Smelting Co., 2 T.C.M. 196 (1943); Portugese-American Tin Co., 2 T.C.M. 270 (1943); cf. Van Clief v. Helvering, 77 U.S.App. D.C. 337, 135 F.2d 254 (1943).

9. Byerlite Corp. v. Williams, 286 F.2d 285 (6th Cir. 1960); Ortmayer v. C. I. R., 265 F.2d 848, 853–855 (7th Cir. 1959); Waterman Steamship Corp. v. United States, 203 F.Supp. 915 (S.D.Ala.1962), rev'd on other grounds, 330 F.2d 128 (5th Cir. 1964); Fairbanks, Morse & Co. v. Harrison, 63 F.Supp. 495 (N.D.Ill. 1945); American Zinc, Lead & Smelting Co., supra.

10. Jennings v. United States, supra; Alma de B. Spreckels, 8 T.C.M. 1113 (1949).

11. Byerlite Corp. v. Williams, supra; Alma de B. Spreckels, supra; Lucia C. Ewing, 5 T.C.M. 908 (1946); cf. Van Clief v. Helvering, supra.

12. Maloney v. Spencer, supra; Fairbanks, Morse & Co. v. Harrison, supra; Waterman Steamship Corp. v. United States, supra; Van Clief v. Helvering, supra.

obligations to pay fixed and determinable sums of money (see: Treasury Regulation § 1.166–1(c) ); they were transferable; they did not confer any right to Troop to participate in the management of Alabama; they were not subordinated to the claims of other creditors; since there is doubt that Troop ever had actual possession of the collateral mentioned in six of the notes, they may be viewed as ordinary unsecured interest-bearing notes.[13] In the circumstances, they can be and should be characterized as creating debts and as giving rise to bona fide loans for tax purposes.

The instruments involved between Troop and Alabama were conventional in form and contained no ambiguity on their faces. The parties had objectively manifested their intent to create indebtedness. We do not think their acts and obvious intent should be disregarded in characterizing the transactions for federal tax purposes. Cf. Kraft Foods Co. v. C. I. R., 232 F.2d 118 (2d Cir. 1956).

Of course, the control by the parent corporation is apparent from the fact that Alabama and the taxpayer had common officers and directors, none of whom were called to testify. Accordingly, the transactions are subject to careful scrutiny. But what do the circumstances reveal as to the substance of the advances up to the date of Alabama's insolvency? The parent was losing money; it needed money to loan to purchasers of motor vehicles in order to make money; it was borrowing money from many sources other than its subsidiary. Any overreaching by the parent, if there was such, ought not to make its subsidiary lose parity with loans obtained from independent lenders. Domination of a subsidiary by its parent has not been proscribed by the law; hence, if actual debts were intended, with reasonable expectation of repayment, the subsidiary should not be penalized by what turned out to be the bad judgment of the common officers, who presumably acted for the benefit of Alabama and all its subsidiaries, including Troop. This is especially appropriate when independent investors were loaning money to Alabama during the same period and it does not appear that they were entitled to preferential treatment on repayments.

In ascertaining whether the advances made by Troop to its parent constituted deductible bad debts, we do not feel bound by hindsight. Rather, we must look at the total picture at the time the advances were made. At that time, no one contemplated insolvency and eventual bankruptcy. Money was being borrowed, repayment was expected, and partial repayments were made. (See quotation from 1 Mertens, Law of Federal Income Taxation, § 9.21, supra.)

As heretofore stated, the taxpayer has met its burden of proving that the advances prior to insolvency were bad debts and wholly worthless in 1957; the defendant has not refuted taxpayer's prima facie case by contradictory evidence; his conclusion that those advances were dividends is without factual foundation. Cf. Waterman Steamship Corp. v. United States, 203 F.Supp. 915, 919 (S.D.Ala. 1962), rev'd on other grounds, 330 F.2d 128 (5th Cir. 1964).

However, after Alabama's insolvency became evident on March 31, 1957, we are not convinced by the evidence that the corporations entertained a reasonable expectation that advances made thereafter to Alabama would be repaid; hence, in our opinion, the plaintiffs have not sustained their burden of proving that the post-solvency advances created bona fide debts.

### CONCLUSIONS OF LAW

1. The taxpayer is entitled to a bad debt deduction for the taxable year 1957 under § 166(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 166(a), in the amount of $178,968.97.

2. The taxpayer sustained a net operating loss for the taxable year 1957

---

13. The balances owing were consolidated in the replacement note given to Troop on June 18, 1957.

**650**

in the amount of $101,242.40, which loss is available for carrybacks and carry-overs in accordance with the provisions of § 172 of the Internal Revenue Code of 1954, 26 U.S.C. § 172.

3. The taxpayer is entitled to the refunds claimed for the taxable year 1955 in the amount of $6,330.23 and for the taxable year 1956 in the amount of $12,-959.32, together with interest.

4. The taxpayer is entitled to carry over its 1957 net operating loss to the extent permitted by the findings of fact and by § 172 of the Internal Revenue Code of 1954, 26 U.S.C. § 172.

5. The United States of America, intervenor, is entitled to recover from the taxpayer excise, unemployment, and Federal Insurance Contributions Act taxes in the total amount of $2,494.78, and the corporate income taxes, penalties and interest, for the years 1958 through

1960, less net operating loss deductions for those years permitted by the findings of fact and conclusions of law and § 172.

6. The pretrial order directing the substitution of the United States of America as a party defendant should be vacated.

7. The costs should be paid by the defendant, Bingler. Williams v. Patterson, 289 F.2d 485 (5th Cir. 1961); Lichter Foundation, Inc. v. Welch, 269 F.2d 142 (6th Cir. 1959).

8. The parties will be directed to settle an order in accordance with the findings of fact and conclusions of law. Final decision will be entered upon submission by counsel of an agreed form of judgment, in which the court will certify that in performing his official duties involved herein, the defendant, Bingler, had probable cause.

APPENDIX A

| Year or Quarter | Date of Assessment | Tax Assessed | Penalty Assessed | Interest Assessed | Total Assessment | Date of Notice and Demand | Unpaid Balance |
|---|---|---|---|---|---|---|---|
| 2nd quarter 1958 | Sept. 5, 1958 | Federal Insurance Contributions Act $ 4,943.94 | $ 78.71 | $ 9.95 | $ 5,032.70 | Sept. 8, 1958 | $ 1,664.97 |
| 2nd quarter 1958 | Sept. 5, 1958 | Excise 79.37 | 3.97 | 0.29 | 83.63 | Sept. 8, 1958 | 13.84 |
| 3rd quarter 1958 | Nov. 28, 1958 | Excise 21.95 | — | 0.10 | 22.05 | Nov. 28, 1958 | 22.05 |
| 1958 | Dec. 11, 1959 | Federal Unemployment Tax Act: 754.82 | — | 39.10 | 793.92 | Dec. 11, 1959 | 793.92 |
| 1957 | July 28 1960 | Corporation Income 26,596.86 | 6,049.21 | 3,780.40 | 37,026.47 | July 28, 1960 | 37,026.47 |
| 1958 | July 28, 1960 | Corporation Income 14,962.51 | — | 1,228.97 | 16,191.48 | July 28, 1960 | 16,191.48 |
| 1959 | Sept. 19, 1961 | Corporation Income 3,126.10 | — | 283.40 | 3,409.50 | Sept. 19, 1961 | 3,409.50 |
| 1960 | Sept. 19, 1961 | Corporation Income 533.58 | — | 16.35 | 549.93 | Sept. 19, 1961 | 549.93 |